**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LEAGUE OF CALIFORNIA CITIES; LEAGUE OF OREGON CITIES; CITY OF GLENDORA, CALIFORNIA; CITY OF RANCHO PALOS VERDES; CITY OF TORRANCE, CALIFORNIA, | No.20-71765 |
| | FCC No. 19-250 |
| *Petitioners*, | |
| | OPINION |
| CITY OF COCONUT CREEK, FLORIDA; CITY OF THOUSAND OAKS, CALIFORNIA; NATIONAL ASSOCIATION OF TELECOMMUNICATIONS OFFICERS AND ADVISORS; TOWN OF BRECKENRIDGE, COLORADO, | |
| *Intervenors*, | |
| v. | |
| FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA, | |

*Respondents*,

CTIA - THE WIRELESS
ASSOCIATION; THE WIRELESS
INFRASTRUCTURE
ASSOCIATION,

*Intervenors*.

| | |
|---|---|
| CITY OF SEATTLE WASHINGTON; CITY OF BEAVERTON, OREGON; CITY OF CARLSBAD, California; CITY OF CERRITOS, California; CITY OF CONCORD, California; CITY OF CORONADO, California; CITY OF ENCINITAS, California; CITY OF HERMISTON, California; CITY OF NAPA, California; CITY OF PLEASANTON, California; CITY OF RICHMOND, CALIFORNIA; CITY OF SAN MARCOS, California; CITY OF SAN RAMON, California; CITY OF SANTA CRUZ, California; CITY OF SOLANA BEACH, California; CITY OF SOUTH LAKE TAHOE, California; CITY OF TUMWATER, Washington; COLORADO COMMUNICATIONS AND UTILITY ALLIANCE; TOWN OF DANVILLE, California, | No.20-72734<br><br>FCC No.<br>FCC-20-75 |

*Petitioners*,

COUNTY OF MARIN, California;
SAN FRANCISCO CITY AND
COUNTY, California,

*Intervenors*,

v.

FEDERAL COMMUNICATIONS
COMMISSION; UNITED STATES
OF AMERICA,

*Respondents*,

WIRELESS INFRASTRUCTURE
ASSOCIATION; CTIA - THE
WIRELESS ASSOCIATION,

*Intervenors*.

CITY OF BOSTON, Massachusetts;     No.20-72749
CITY OF BROOKHAVEN, Georgia;
CLARK COUNTY NEVADA; CITY          FCC No.
OF CULVER CITY, California; CITY    FCC-20-75
OF EMERYVILLE, California; CITY
OF GAITHERSBURG, Maryland;
CITY OF GIG HARBOR,

Washington; TOWN OF HILLSBOROUGH, California; HOWARD COUNTY, Maryland; CITY OF KIRKLAND, Washington; CITY OF LINCOLN, Nebraska; MONTGOMERY COUNTY, Maryland; CITY OF ONTARIO, California; CITY OF PIEDMONT, California; CITY OF PLANO, Texas; CITY OF PORTLAND, Oregon; CITY OF ROCKVILLE, Maryland; CITY OF LOS ANGELES, California; TEXAS COALITION OF CITIES FOR UTILITY ISSUES; TEXAS MUNICIPAL LEAGUE; MICHIGAN MUNICIPAL LEAGUE; PROTEC; U.S. CONFERENCE OF MAYORS,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,

*Respondents*.

On Petition for Review of an Order of the
Federal Communications Commission

Argued and Submitted July 11, 2023
San Francisco, California

Filed September 13, 2024

Before:  Carlos T. Bea, Mark J. Bennett, and Holly A.
Thomas, Circuit Judges.

Per Curiam Opinion;
Partial Dissent and Partial Concurrence by Judge Bennett

## SUMMARY[*]

### Federal Communications Commission

The panel granted in part and denied in part a petition for review brought by local governments and municipal organizations challenging the Federal Communications Commission's 2020 Ruling that purports to interpret and clarify existing legislative rules (the "2014 Order") adopted to implement section 6409(a) of the Middle Class Tax Relief and Job Creation Act of 2012 (the "Spectrum Act"), which requires state and local governments to approve certain requests for modification of wireless communications networks that do not "substantially change" existing wireless facilities.

Petitioners challenged the following provisions of the FCC's 2020 Ruling: (1) the Shot Clock Rule, which clarified

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

the date on which an applicant is deemed to have submitted an eligible facilities request for purposes of triggering the 60-day shot clock—the time frame within which a siting authority must determine whether a modification is an eligible facilities request that the siting authority must approve; (2) the Separation Clause, which clarified when a modification that increases the height of a wireless tower outside of the public right-of-way causes a substantial change; (3) the Equipment Cabinet Provision Clarification, which clarified when the addition of equipment cabinets to a support structure constitutes a substantial change; (4) the Concealment and Siting Approval Conditions Provisions, which clarified when a modification substantially changes the physical dimensions of an existing structure by defeating the concealment elements of the eligible support structure; and (5) the Express Evidence Requirement, which clarified that to be a concealment element under the Concealment Provision, the element must have been part of the facility that the siting authority approved in its prior review, as shown by direct evidence.

Under the Administrative Procedure Act, courts must set aside agency action that is arbitrary and capricious. First, courts examine whether an agency rule is interpretive or legislative; an agency action is not in accordance with law if it is a legislative rule masquerading as an interpretive rule. Second, when faced with an agency's interpretation of its own regulation, courts must examine whether the regulation is genuinely ambiguous. Third, even if a regulation is a permissible interpretive rule, court may still strike it down under the APA's arbitrary-and-capricious standard, which requires that agency action be reasonable.

Applying this standard, the panel held that: (1) the 2020 Ruling's clarification of the Shot Clock Rule was consistent

with the 2014 Order, was an interpretive rule, and the clarification was not arbitrary or capricious; (2) the 2020 Ruling's clarification of the Separation Clause was an interpretative rule because the Separation Clause is unambiguous and supports the FCC's interpretation in its 2020 Ruling, and the clarification was neither arbitrary nor capricious; and (3) the 2020 Ruling's Equipment Cabinet Provisions Clarifications were consistent with the 2014 Order's unambiguous text, were interpretive rules, and were not arbitrary or capricious. Accordingly, the panel denied the petition for review with respect to these provisions. However, the 2020 Ruling's clarifications of the Concealment and Siting Approval Conditions Provisions were inconsistent with the 2014 Order, and therefore were legislative rules. Further, the FCC's error in not following the APA's procedural requirements in issuing these legislative rules was not harmless. Accordingly, the panel granted the petition for review with respect to the Concealment and Siting Approval Conditions Provisions.

Finally, the panel denied the petition for review as to the 2020 Ruling's clarification of the Express Evidence Requirement because, contrary to petitioners' contention, application of the Express Evidence Requirement would not have retroactive effect.

Dissenting in part and concurring in part, Judge Bennett joined the per curiam opinion with respect to the Equipment Cabinet Provision and the Concealment Provision. Judge Bennett wrote separately for four reasons: First, he would grant the petition for review with respect to the Shot Clock Rule because the FCC's purported clarification of the commencement of the shot clock is inconsistent with the unambiguous language of the 2014 order and is therefore a legislative rule. Further, the FCC's error was not harmless.

Second, he would grant the petition for review with respect to the Express Evidence Requirement because it is retroactive, and the Spectrum Act does not authorize the FCC to engage in retroactive rulemaking. Third, while he agreed with the per curiam opinion that the 2020 Ruling's clarification of the Separation Clause is an interpretive rule, he would reach that conclusion by finding that the Separation Clause is ambiguous, and that the FCC's clarification is entitled to *Auer* deference. Fourth, he wrote separately on the Concealment and Siting Approval Conditions Provisions to explain that, even were such provisions ambiguous, he would not accord the FCC's clarifications deference.

## COUNSEL

Cheryl A. Leanza (argued), Joseph V. Eaton, and Tillman L. Lay, Best Best & Krieger LLP, Washington, D.C.; Gail A. Karish, Best Best & Krieger LLP, Los Angeles, California; Robert C. May III (argued), Jonathan L. Kramer, and Michael D. Johnston, Telecom Law Firm PC, San Diego, California; Kenneth S. Fellman, Kissinger & Fellman PC, Denver, Colorado; Jeffrey M. Bayne and Lauren L. Springett, Spiegel & McDiarmid LLP, Washington, D.C.; Nancy L. Werner, National Association of Telecommunications Officers, Alexandria, Virginia; for Plaintiffs and Intervenor-Plaintiffs-Petitioners.

Rachel P. May (argued) and Lori Alexiou, Counsel; Richard K. Welch, Deputy Associate General Counsel; P. Michele Ellison, General Counsel; Office of General Counsel, Litigation Division; Jacob M. Lewis, Deputy General Counsel; Public Safety and Homeland Security Bureau;

Federal Communications Commission, Washington, D.C.; Matthew C. Mandelberg and Robert B. Nicholson, Attorneys, Antitrust Division, Appellate Section; Jonathan S. Kanter, Assistant Attorney General, United States Department of Justice; Washington, D.C.; Joshua S. Turner (argued), Sara M. Baxenberg, and Boyd Garriott, Wiley Rein LLP, Washington, D.C.; John Howes, Michael Saperstein and Stephen Keegan, Wireless Infrastructure Association, Arlington, Virginia; Thomas S. Thompson and Daniel P. Reing, Mintz Levin Cohn Ferris Glovsky and Popeo PC; Washington, D.C.; Thomas Power, CTIA – The Wireless Association, Washington, D.C.; for Respondents and Intervenor-Defendants-Respondents.

---

## OPINION

PER CURIAM:

Wireless communications depend on a network of antennas and equipment placed on structures including towers, buildings, and utility poles. Construction and modification of these networks implicate the zoning and land use laws of state and local governments. Section 6409(a) of the Middle Class Tax Relief and Job Creation Act of 2012 ("Spectrum Act")[1] requires those governments to approve certain modification requests that do not "substantially change" existing wireless facilities. Under section 6003 of the Spectrum Act, the Federal Communications Commission ("FCC") "shall implement and enforce" the Act as if it "is a part of the Communications Act of 1934," 47 U.S.C. § 1403,

---

[1] Pub. L. No. 112-96, § 6409(a), 126 Stat. 156, 232–33 (2012) (codified at 47 U.S.C. § 1455(a)).

which gives the FCC the authority to "perform any and all acts, make such rules and regulations, and issue such orders . . . necessary in the execution of its functions," *id.* § 154(i).

This petition for review arises from a declaratory ruling in 2020 ("2020 Ruling") by the FCC that purports to interpret and clarify[2] existing legislative rules adopted to implement section 6409(a). As relevant here, the FCC's interpretations of its regulations cover when an automatic federal authorization[3] to modify a facility may issue, irrespective of local zoning laws or permit restrictions that might otherwise either bar or impose additional requirements on such construction or modification.

---

[2] The FCC referred to various rulings as "clarifications." When we use "clarifications" or "clarify," we are simply echoing the FCC's description. Our use of those words does not signify agreement that the FCC's actions were simply "clarifications."

[3] Section 6409(a) states that a state or local government "*may not deny, and shall approve*, any eligible facilities request for a modification of an existing wireless tower or base station that does not substantially change the physical dimensions of such tower or base station." 47 U.S.C. § 1455(a)(1) (emphasis added). The FCC and some courts have interpreted section 6409(a) in such a way as to avoid Tenth Amendment issues created if the statute were read to compel affirmative action by state and local governments. *See* In re Acceleration of Broadband Deployment by Improving Wireless Facilities Siting Policies, 29 FCC Rcd. 12865, 12875 (Oct. 17, 2014), *amended by* 30 FCC Rcd. 31 (Jan. 5, 2015) ("[We] [p]rovide that an application filed under [s]ection 6409(a) is *deemed granted* if a State or local government fails to act on it within the requisite time period[.]" (emphasis added)); *Montgomery County v. FCC*, 811 F.3d 121, 128 (4th Cir. 2015) (concluding that the FCC's "deemed granted" procedure is constitutional because it "does not require the states to take any action at all" and "[i]nstead . . . allows the applications to be granted by default if the state does not affirmatively approve them within sixty days").

Petitioners and Intervenors (collectively, "Petitioners") are local governments and municipal associations, representing about 780 municipalities. Petitioners seek review of the 2020 Ruling. They raise various procedural and substantive challenges to the FCC's interpretations and clarifications.

The 2020 Ruling clarified (1) the commencement of the shot clock, that is, "the date on which an applicant is deemed to have submitted an eligible facilities request for purposes of triggering the 60-day shot clock"; (2) when "a modification on a tower outside of the public rights-of-way would cause a substantial change," by specifying how to calculate the separation between an existing antenna and a proposed new antenna; (3) when "a proposed modification to a support structure constitutes a substantial change," by specifying whether there is a cumulative limit to the number of equipment cabinets and what an equipment cabinet is; (4) when "a modification 'substantially changes' the physical dimensions of an existing structure" by "defeat[ing] the concealment elements of the eligible support structure," and the distinction between a "concealment element" of an eligible support structure and "conditions associated with the siting approval" of an eligible support structure; and (5) what evidence the local government must show regarding a preexisting "condition of approval" of a wireless facility. Petitioners object to all these clarifications.

We grant the petition for review in part and deny it in part. We grant the petition as to the FCC's clarifications regarding (4) the definition of a qualifying concealment element. We invalidate that clarification.

We deny the petition for review as to (1) the commencement of the shot clock, (2) the separation between an existing antenna and a proposed new antenna, (3) the

noncumulative limit on the number of equipment cabinets that are an insubstantial change and the FCC's definition of an "equipment cabinet," and (5) the "express evidence" requirement for preexisting conditions.

# I.  FACTUAL AND PROCEDURAL BACKGROUND

## A.    Statutory Framework

Two statutory provisions limit or affect the "siting authority," that is, "a State government, local government, or instrumentality . . . whose authorization is necessary prior to the deployment of personal wireless service facilities." 47 C.F.R. § 1.6002(k).[4]

### 1.    Section 704 of the Telecommunications Act

In 1996, Congress first addressed local authority over the deployment of personal wireless service facilities—through section 704 of the Telecommunications Act.[5]  Section 704 generally "[p]reserv[es] . . . local zoning authority" "over decisions regarding the placement, construction, and modification of personal wireless service facilities."  47 U.S.C. § 332(c)(7)(A).  That general rule, however, is subject to certain enumerated limitations.  *Id.* § 332(c)(7)(B); *see also T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 303 (2015).

Under the limitations, siting decisions may not "unreasonably discriminate among providers of functionally equivalent services," "prohibit or have the effect of prohibiting the provision of personal wireless services," or

---

[4] "Deployment means placement, construction, or modification of a personal wireless service facility."  47 C.F.R. § 1.6002(h).

[5] Pub. L. No. 104-104, § 704, 110 Stat. 56, 151–52 (1996) (codified at 47 U.S.C. § 332(c)(7)).

be based on "the environmental effects of radio frequency emissions to the extent that such facilities comply with the [FCC]'s regulations concerning such emissions."  47 U.S.C. § 332(c)(7)(B)(i), (iv).  A siting authority must act on siting applications[6] "within a reasonable period of time after the request is duly filed," *id.* § 332(c)(7)(B)(ii), a requirement the FCC calls a "shot clock."  The shot clock requires siting authorities to act within 60, 90, or 150 days, depending on the type of facility.  *See* 47 C.F.R. § 1.6003(c)(1).  Siting decisions must be "in writing and supported by substantial evidence contained in a written record," 47 U.S.C. § 332(c)(7)(B)(iii), and denials or failures to act may be challenged in court within 30 days of the denial or expiration of the shot clock and are entitled to "expedited" review, *id.* § 332(c)(7)(B)(v).

### 2.    Section 6409(a) of the Spectrum Act

Section 6409(a) of the Spectrum Act states:

> [A] State or local government may not deny, and shall approve, any eligible facilities request for a modification of an existing wireless tower or base station that does not substantially change the physical dimensions of such tower or base station.

*Id.* § 1455(a)(1).

An "eligible facilities request" includes "any request for modification of an existing wireless tower or base station that involves . . . collocation of new transmission

---

[6] "Siting application or application means a written submission to a siting authority requesting authorization for the deployment of a personal wireless service facility at a specified location."  47 C.F.R. § 1.6002(j).

equipment." *Id.* § 1455(a)(2)(A). "Collocation" refers to the "mounting or installation of transmission equipment on an eligible support structure for the purpose of transmitting and/or receiving radio frequency signals for communications purposes." 47 C.F.R. § 1.6100(b)(2).

## B.  The 2014 Order

The key operative terms in section 6409 are not defined. In September 2013, the FCC issued a notice of proposed rulemaking. In re Acceleration of Broadband Deployment by Improving Wireless Facilities Siting Policies, 28 FCC Rcd. 14238 (Sept. 26, 2013). After a notice-and-comment period, the FCC issued a report and order to implement section 6409(a). In re Acceleration of Broadband Deployment by Improving Wireless Facilities Siting Policies, 29 FCC Rcd. 12865 (Oct. 17, 2014) (hereinafter "2014 Order"). The order also codified rules to implement section 6409(a) at 47 C.F.R. § 1.6100.[7]

The 2014 Order focused on three general subjects: (1) defining the statutory terms, such as "substantially change"; (2) establishing procedural rules for applications, including a shot clock specific to eligible facilities requests ("Shot Clock Rule"); and (3) providing that applications will be "deemed granted" if the state or local government fails to approve or deny the request within the appropriate timeframe.

### 1.  Defining the Statutory Terms:

A "[t]ower," as used in section 6409(a), refers to "[a]ny structure built for the sole or primary purpose of supporting

---

[7] "2014 Order," as used in this opinion, refers to both the FCC's 2014 Order and the rules codified at 47 C.F.R. § 1.6100.

any [FCC]-licensed or authorized antennas and their associated facilities." 47 C.F.R. § 1.6100(b)(9). "Base station" means any non-tower "structure or equipment at a fixed location that enables [FCC]-licensed or authorized wireless communications." *Id.* § 1.6100(b)(1). A "constructed tower or base station" is "existing" if it "has been reviewed and approved under the applicable zoning or siting process, or under another State or local regulatory review process." *Id.* § 1.6100(b)(5).

The 2014 Order further clarified that "[a] modification substantially changes the physical dimensions of an eligible support structure"[8] if it meets any of the following:

> For towers other than towers in the public rights-of-way, it increases the height of the tower by more than 10% or by the height of one additional antenna array with separation from the nearest existing antenna not to exceed twenty feet, whichever is greater [the "**Separation Clause**"]; for other eligible support structures, it increases the height of the structure by more than 10% or more than ten feet, whichever is greater[.]

*Id.* § 1.6100(b)(7)(i). We refer to this as the "**Tower Height Provision**."

> For any eligible support structure, it involves installation of more than the standard number of new equipment cabinets for the technology

---

[8] An "[e]ligible support structure" is "[a]ny tower or base station . . . existing at the time the relevant [siting] application is filed with the" siting authority. 47 C.F.R. § 1.6100(b)(4).

> involved, but not to exceed four cabinets; or, for towers in the public rights-of-way and base stations, it involves installation of any new equipment cabinets on the ground if there are no pre-existing ground cabinets associated with the structure, or else involves installation of ground cabinets that are more than 10% larger in height or overall volume than any other ground cabinets associated with the structure[.]

*Id.* § 1.6100(b)(7)(iii).  We refer to this as the "**Equipment Cabinet Provision**."

> It would defeat the concealment elements of the eligible support structure[.]

*Id.* § 1.6100(b)(7)(v).  We refer to this as the "**Concealment Provision**."

> It does not comply with conditions associated with the siting approval of the construction or modification of the eligible support structure or base station equipment, provided however that this limitation does not apply to any modification that is non-compliant only in a manner that would not exceed the thresholds

identified in [47 C.F.R. § 1.6100(b)(7)(i)–(iv)].**[9]**

*Id.* § 1.6100(b)(7)(vi).   We refer to this as the "**Siting Approval Conditions Provision**."

### 2.  The Shot Clock Rule and Deemed-Granted Remedy

Section 6409(a) does not establish a time frame within which a siting authority must determine whether a modification is an "eligible facilities request" that the siting authority "shall approve."   47 U.S.C. § 1455(a)(1).   In response to comments, the FCC explained that "approval within a reasonable period of time" is "implicit in the statutory requirement" of mandatory approval.  2014 Order, 29 FCC Rcd. at 12955.  The FCC then stated:

> [W]e establish a specific and absolute timeframe for State and local processing of eligible facilities requests under [s]ection 6409(a).  We find that a 60-day period for review, including review to determine whether an application is complete, is appropriate. . . .
>
> . . . .
>
> We further provide that the foregoing [s]ection 6409(a) timeframe may be tolled by mutual agreement or in cases where the

---

[9] Section 1.6100 was originally numbered as 47 C.F.R. § 1.40001.  *See* Accelerating Wireless and Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment, 83 Fed. Reg. 51867, 51885–86 (Oct. 15, 2018).

> reviewing State or municipality informs the applicant in a timely manner that the application is incomplete.

*Id.* at 12956–57.

When a siting authority fails to approve or deny an application filed as an eligible facilities request "within the timeframe for review (accounting for any tolling), the request shall be deemed granted" and effective upon written notice from the applicant.  47 C.F.R. § 1.6100(c)(4).  The siting authority can seek judicial review following such written notice from the applicant.  *See* 2014 Order, 29 FCC Rcd. at 12962.

### C.     The 2019 Petitions

In late 2019, two wireless industry trade associations, the Wireless Infrastructure Association ("WIA") and CTIA—The Wireless Association ("CTIA"), petitioned the FCC for declaratory rulings and a rulemaking that sought changes to the FCC's section 6409(a) rules. [10]   WIA and CTIA (collectively, "Industry Intervenors") filed a brief in support of the FCC in this appeal.

The 2019 Petitions sought five clarifications that are at issue here.  *First*, the 2019 Petitions asked the FCC to "clarify when the section 6409(a) shot clock begins to run,"

---

[10] Petition of WIA for Declaratory Ruling, WT Docket No. 17-79 (filed Aug. 27, 2019) ("WIA Pet."); Petition of WIA for Rulemaking, RM-11849 (filed Aug. 27, 2019); Petition of CTIA for Declaratory Ruling, WT Docket No. 17-79, WC Docket No. 17-84 (filed Sept. 6, 2019) ("CTIA Pet.") (collectively, "2019 Petitions").  Most changes requested by the industry trade associations appeared in the petitions for a declaratory ruling.  The petition for rulemaking concerned issues not subject to this petition for review.

citing examples of siting authorities imposing "lengthy and onerous processes" "to prevent the section 6409(a) shot clock from starting." WIA Pet. 7–9 (capitalization altered) (citations and quotations omitted); *see also* CTIA Pet. 17–20.

*Second*, the 2019 Petitions asked the FCC to clarify that the phrase "separation from the nearest existing antenna"—in the Separation Clause—means the space between antennas, *not* inclusive of the proposed antenna. WIA Pet. 17–18.

*Third*, the 2019 Petitions asked the FCC to clarify the Equipment Cabinet Provision, stating that some siting authorities had asserted that this provision "set[] a cumulative limit" on the number of equipment cabinets that can be added, "rather than a limit on the number of cabinets associated with a particular" modification. CTIA Pet. 14; WIA Pet. 13.

*Fourth*, the 2019 Petitions asked the FCC to clarify that "concealment elements"—as used in the Concealment Provision—are "aspects of a design that were specifically intended to disguise the appearance of a facility, such as faux tree branches or paint color." CTIA Pet. 12; *see also* WIA Pet. 10–13.

*Fifth*, the 2019 Petitions asked the FCC to clarify that "concealment elements" include only such "elements that were specifically identified as concealment elements when the structure was built." CTIA Pet. 12. Similarly, the 2019 Petitions asked the FCC to clarify that "conditions associated with the siting approval"—as used in the Siting Approval Conditions Provision—include only those "prior conditions imposed on a structure or site." WIA Pet. 14–15.

One week later, the Wireless Telecommunications Bureau ("WTB") and Wireline Competition Bureau ("WCB")—two agencies within the FCC—opened proceedings with a request for public comment. *See* Wireless Telecommunications Bureau and Wireline Competition Bureau Seek Comment on WIA Petition for Rulemaking, WIA Petition for Declaratory Ruling and CTIA Petition for Declaratory Ruling, 34 FCC Rcd. 8099 (Sept. 13, 2019), https://docs.fcc.gov/public/attachments/DA-19-913A1.pdf (hereinafter 2019 Notice).

These proceedings were unusual in several respects. First, the 2019 Notice included no indication as to whether the FCC would consider any requested changes and, if so, which ones. Some commenters urged the FCC to follow the notice-and-comment procedures under the Administrative Procedure Act ("APA"), but the FCC refused. Second, the 2019 Notice set a comment date of October 15, 2019, and a reply comment date of October 30, 2019. *Id.* Despite waiting 13 days to publish the 2019 Notice in the Federal Register, the FCC did not adjust the deadlines for comments and reply comments to account for the lag time, so after the publication of the 2019 Notice there were only 19 days for comments and 34 days for reply comments. *See* 84 Fed. Reg. 50810 (Sept. 26, 2019). After receiving multiple requests for an extension, the FCC granted an additional 14 days for comments and reply comments.[11] After more requests, the FCC extended the reply comment deadline by

---

[11] *See Order Granting Extension of Time*, WT Docket No. 19-250, RM-11849, WC Docket No. 17-84, DA 19-978 (Sept. 30, 2019), https://docs.fcc.gov/public/attachments/DA-19-978A1.pdf.

another seven days. **12** Third, in May 2020, the FCC published on its website the draft declaratory ruling for consideration at the next FCC meeting. *Declaratory Ruling and Notice of Proposed Rulemaking*, WT Docket No. 19-250, RM-11849 (rel. May 19, 2020) (hereinafter 2020 Draft Ruling). Multiple requests for additional time to comment on the proposed changes were denied by the FCC notwithstanding state and local government attention to the COVID-19 pandemic and the economic recession. *See infra* Section I.D.5.

Throughout the proceeding, more than 70 local governments or organizations submitted more than 650 pages of comments and letters regarding the 2019 Petitions and the 2020 Draft Ruling. On June 10, 2020, the FCC issued a final declaratory ruling. In re Implementation of State and Local Governments' Obligation to Approve Certain Wireless Facility Modification Requests Under Section 6409(a) of the Spectrum Act of 2012, 35 FCC Rcd. 5977 (June 10, 2020) (hereinafter 2020 Ruling).

### D. The 2020 Ruling

The FCC described the 2020 Ruling as interpretive only, and "necessary to ensure fidelity to the language [of the FCC rules] and the decisions Congress made in [s]ection 6409(a)." 2020 Ruling, 35 FCC Rcd. at 5979.

### 1. The Commencement of the Shot Clock

The 2020 Ruling clarified "the date on which an applicant is deemed to have submitted an eligible facilities request for purposes of triggering the 60-day shot clock." *Id.*

---

[12] *See Order Granting Motion for Extension of Time*, WT Docket No. 19-250, RM-11849, WC Docket No. 17-84, DA 19-1162 (Nov. 8, 2019), https://docs.fcc.gov/public/attachments/DA-19-1162A1_Rcd.pdf.

at 5985. It clarified that an applicant has "submitted a request for approval that triggers the running of the shot clock" when the applicant (1) "takes the first procedural step that the local jurisdiction requires as part of its applicable regulatory review process under section 6409(a)," and (2) "submits written documentation showing that a proposed modification is an eligible facilities request." *Id.* at 5986. The "first step" must be within "the applicant's control" and "objectively verifiable." *Id.* at 5987. For example, if the first step is a meeting with municipal staff, an applicant satisfies the requirement simply by requesting such a meeting. *See id.* But to trigger the shot clock, the applicant would also need to submit "written documentation showing that the proposed modification is an eligible facilities request." *Id.* at 5986.

### 2.    Substantial Changes as to the Separation Clause

The 2020 Ruling clarified when a modification that increases the height of a tower outside of the public rights-of-way causes a "substantial change." *Id.* at 5989. It clarified that the phrase "separation from the nearest existing antenna" in the Separation Clause means the space between the antennas—i.e., "the distance from the top of the highest existing antenna on the tower to the *bottom* of the proposed new antenna to be deployed above it." *Id.* at 5990.

### 3.    Substantial Changes as to the Equipment Cabinet Provision

The 2020 Ruling clarified when the addition of equipment cabinets "to a support structure constitutes a substantial change." *Id.* at 5991. It clarified the Equipment Cabinet Provision in two ways. First, it clarified that the four-cabinet limit "is measured for each separate eligible facilities request," and is not a cumulative limit. *Id.* at 5992.

The FCC explained that to interpret the four-cabinet limit as cumulative "ignores the fact that the word 'it' in the rule refers to a 'modification'" of an eligible support structure. *Id.*; *see* 47 C.F.R. § 1.6100(b)(7)(iii) (defining a modification as substantial when "it" exceeds a threshold number of cabinets). The 2020 Ruling rejected the argument that "this clarification would permit an applicant to add an unlimited number of new equipment cabinets" because 47 C.F.R. § 1.6100(b)(7)(iii) limits each modification to "the standard number of new equipment cabinets for the technology involved." 2020 Ruling, 35 FCC Rcd. at 5993 (quoting 47 C.F.R. § 1.6100(b)(7)(iii)).

Second, the 2020 Ruling clarified that, consistent with industry usage and the structure of the rules, "equipment cabinets" refers only to "physical containers for smaller, distinct devices," and not to "transmission equipment manufactured with outer protective covers." *Id.* at 5991–92.

4. Substantial Changes as to the Concealment Provision and Siting Approval Conditions Provision

The 2020 Ruling clarified when "a modification 'substantially changes' the physical dimensions of an existing structure" by "defeat[ing] the concealment elements of the eligible support structure." *Id.* at 5993 (quoting 47 C.F.R. § 1.6100(b)(7)(v)). In doing so, the FCC sought to distinguish "concealment elements" covered by 47 C.F.R. § 1.6100(b)(7)(v) from "conditions associated with the siting approval" covered by 47 C.F.R. § 1.6100(b)(7)(vi). This distinction is significant because "concealment elements" are afforded greater protection than "conditions associated with the siting approval," which conditions can

be overcome if the proposed modification is otherwise permitted under 47 C.F.R. § 1.6100(b)(7)(i)–(iv).

The 2020 Ruling clarified that "concealment elements are elements of a stealth-designed facility intended to make the facility look like something other than a wireless tower or base station," such as a "pine tree, flag pole, or chimney." 2020 Ruling, 35 FCC Rcd. at 5994, 5996. These concealment elements are "defeated" when "the proposed modification . . . cause[s] a reasonable person to view the structure's intended stealth design as no longer effective after the modification," *id.* at 5996, such as by making a facility that was originally constructed to look like a tree no longer resemble a tree. The FCC explained that its interpretation was consistent with language in the 2014 Order that "defines 'concealed or "stealth"-designed' facilities as 'facilities designed to look like some feature other than a wireless tower or base station.'" *Id.* at 5994 (quoting 2014 Order, 29 FCC Rcd. at 12950).

The 2020 Ruling further clarified that other "conditions to minimize the visual impact of non-stealth facilities," which are "separately address[ed]" under the Siting Approval Conditions Provision at 47 C.F.R. § 1.6100(b)(7)(vi), are to be distinguished from the concealment elements under the Concealment Provision at 47 C.F.R. § 1.6100(b)(7)(v). *Id.* at 5995. The 2020 Ruling disagreed with the position advanced by many commenters that "any attribute that minimizes the visual impact of a facility, such as a specific location on a rooftop site or placement behind a tree line or fence, can be a concealment element." *Id.* at 5994.

The 2020 Ruling gave as an example "a stealth-designed monopine" that was originally hidden behind a tree line, but

which "a proposed modification" would "make[] . . . visible" above the tree line. *Id.* at 5998. The 2020 Ruling clarified that "the concealment element would not be defeated" under the Concealment Provision "if the monopine retains its stealth design in a manner that a reasonable person would continue to view the intended stealth design as effective." *Id.* The 2020 Ruling explained that the requirement to remain behind the tree line was not a concealment element under the Concealment Provision, but an "aesthetic condition" covered by the Siting Approval Conditions Provision at section 1.6100(b)(7)(vi). *Id.* Such a requirement, "like any other condition under" the Siting Approval Conditions Provision, may still be enforced, but only if it does not prevent modifications otherwise permitted under 47 C.F.R. § 1.6100(b)(7)(i)–(iv), such as increases in height or girth. *Id.* at 5998–99. The 2020 Ruling explained that this interpretation is consistent with the "commonplace . . . statutory construction that the specific" rules regarding modifications "govern[] the general" ability of a siting authority to enforce conditions on approval. *Id.* at 5999 (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)).

### 5. The Express Evidence Requirement

Finally, the 2020 Ruling clarified that to be a "concealment element" under the Concealment Provision, "the element must have been part of the facility that the [siting authority] approved in its prior review," *id.* at 5995, as shown by "express evidence in the record to demonstrate that [the siting authority] considered in its approval that a stealth design for a telecommunications facility would look like something else, such as a pine tree, flag pole, or chimney," *id.* at 5996. We refer to this as the "Express Evidence Requirement." The 2020 Ruling explained that the

requirement "does not mean that a concealment element must have been explicitly articulated," and that "specific words or formulations are not needed." *Id.* "[S]how[ing] that the condition existed at the time of the original approval" was sufficient. *Id.* at 5998 n.123.

Two FCC commissioners dissented from the 2020 Ruling. They argued that the ruling imposed new obligations on local governments at a time when those governments were still coping with the effects of COVID-19; that the ruling created uncertainty; that it was likely to lead to costly disputes between local governments and industry; and that the FCC should have addressed the issues in a formal rulemaking proceeding, providing adequate time for public input.

This petition for review followed.

## II.    JURISDICTION

The 2020 Ruling is a final agency action that took effect on June 10, 2020. We have jurisdiction pursuant to 47 U.S.C. § 402(a), 28 U.S.C. § 2342(1), and 28 U.S.C. § 2344.

## III. LEGAL STANDARD & STANDARD OF REVIEW

Under the APA, we must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### A.  Is the Agency Rule Interpretive or Legislative?

An agency action is "not in accordance with law" if it is a legislative rule masquerading as an interpretive rule. This is because "[a]n agency can issue a legislative rule only by using the notice and comment procedure described in the APA" but "need not follow the notice and comment

procedure to issue an interpretive rule." *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003) (emphasis omitted) (citing 5 U.S.C. § 553(b)).[13]

"Whether an agency rule is interpretive or legislative is a question of law [we] review[] de novo." *Id.* at 1086 (italics omitted). In *Hemp Industries*, we adopted a "helpful framework" from the D.C. Circuit for "distinguishing between interpretive and legislative rules." *Id.* at 1087. Legislative rules "have the 'force of law,'" but interpretive rules "do not have the force and effect of law and are not accorded that weight in the adjudicatory process." *Id.* (quoting *Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 99 (1995)). One circumstance in which a rule has the "force of law" and is therefore legislative is when "the rule effectively amends a prior legislative rule." *Id.* (quoting *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993)). This inquiry focuses on whether the purported interpretation "is inconsistent with a prior rule having the force of law." *Id.* at 1088. This is because "[a]n agency is not allowed to change a legislative rule retroactively through the process of disingenuous interpretation of the rule to mean something other than its original meaning." *Erringer v. Thompson*, 371 F.3d 625, 632 (9th Cir. 2004) (alteration in original) (quoting *Hemp Indus.*, 333 F.3d at 1091). Accordingly, we must evaluate whether the FCC's clarifications in the 2020 Ruling are "inconsistent with" their analogs in the 2014 Order.

---

[13] An agency can be exempted from the notice-and-comment requirement for legislative rules if it publishes a specific finding of good cause documenting why such procedures "are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). This exception is not at issue here.

## B.   Analyzing an Agency's Interpretation of Its Regulation

When faced with an agency's interpretation of its own regulation, we "first determine whether the regulation is 'genuinely ambiguous,'" using "all the standard tools of interpretation," including analysis of the "text, structure, history, and purpose." *Attias v. Crandall*, 968 F.3d 931, 937 (9th Cir. 2020) (quoting *Kisor v. Wilkie*, 588 U.S. 558, 573, 575 (2019)).   If "uncertainty does not exist" as to the regulation's meaning, it just "means what it means." *Kisor*, 588 U.S. at 574–75.

If the 2014 regulation is unambiguous and its meaning is *inconsistent* with the 2020 Ruling's purported clarification, then the clarification is a legislative rule.   But here, if the 2014 regulation is unambiguous and its meaning is *consistent* with the 2020 Ruling's purported clarification, the clarification is an interpretive rule.**[14]**

"[O]nly if a regulation is genuinely ambiguous" can "the possibility of deference" arise. *Id.* at 573.   We defer to the agency's interpretation if it "is 'reasonable,' is based on the agency's 'substantive expertise,' 'reflect[s] [the agency's] fair and considered judgment,' and represents 'the agency's authoritative or official position.'" *Attias*, 968 F.3d at 937 (alterations in original) (quoting *Kisor*, 588 U.S. at 574–79). To reflect the "fair and considered judgment" of the agency,

---

[14] We note this may not always be the case.   For example, if "in the absence of the [new] rule, there would not be an adequate legislative basis for enforcement action," or if the agency "explicitly invoked its general legislative authority" in issuing the new rule, then that new rule—even if consistent with a prior legislative rule—may nevertheless have the "force of law" and constitute a legislative rule. *See Hemp Indus.*, 333 F.3d at 1087 (quoting *Am. Mining*, 995 F.2d at 1112).

the regulatory interpretation cannot be a "convenient litigating position" or a "*post hoc* rationalization." *Kisor*, 588 U.S. at 579 (alteration omitted) (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)). This is known as *Auer* deference.[15]  If an agency's reading of a rule does not meet all four *Auer* factors, that reading may not merit *Auer* deference.  *See Attias*, 968 F.3d at 937.

Even if we do not afford the interpretation *Auer* deference, we still "accord the [agency's] interpretation a measure of deference proportional to the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *SmithKline Beecham Corp.*, 567 U.S. at 159 (internal quotation marks omitted).  This is known as *Skidmore* deference.[16]  *See Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Rels.*, 730 F.3d 1024, 1035 (9th Cir. 2013) ("[W]hen *Auer* deference is not warranted, an agency's interpretation of an ambiguous regulation should be evaluated under the principle laid down in *Skidmore* . . . .").

Moreover, "a court may not defer to a new interpretation . . . that creates 'unfair surprise' to regulated parties." *Kisor*, 588 U.S. at 579 (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007)).  Such a circumstance may arise when an agency's interpretation would "impose[] retroactive liability on parties for longstanding conduct that the agency had never before addressed." *Id.*  Of central concern is that a declaratory ruling *not* be a vehicle to "create *de facto* a new regulation."

---

[15] *Auer v. Robbins*, 519 U.S. 452 (1997).

[16] *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

*Id.* at 575 (quoting *Christensen v. Harris County*, 529 U.S. 576, 588 (2000)).

Here, if a regulation from the 2014 Order is ambiguous and the 2020 Ruling's purported clarification passes muster under *Auer* or *Skidmore* deference, it is an interpretive rule.

## C.  Is the Agency Action Arbitrary and Capricious?

Even if a regulation is a permissible interpretive rule, we may still strike the rule down under the APA's arbitrary-and-capricious standard, which "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  For the action to be "reasonable and reasonably explained," *id.*, the agency must have articulated "a rational connection between the facts found and the choice made," *Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers v. Fed. R.R. Admin.*, 988 F.3d 1170, 1182 (9th Cir. 2021) (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019)).  "It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action."  *Id.* at 1178 (cleaned up) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020)).

"Agencies are free to change their existing policies . . . [b]ut the agency must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

> An agency action is arbitrary and capricious "only if the agency relied on factors Congress did not intend it to consider, entirely failed to

> consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1257 (9th Cir. 2017) (quoting *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013)).  The "deferential" standard "simply ensures that the agency has acted within a zone of reasonableness."  *Prometheus Radio Project*, 592 U.S. at 423.

## IV.    ANALYSIS

We start by analyzing whether each of the 2020 Ruling's relevant purported clarifications are interpretive or legislative rules.  We answer those questions by analyzing first whether the relevant portion of the 2014 Order is unambiguous or ambiguous as a matter of textual interpretation.  If it is unambiguous, we decide whether the FCC's purported clarification is consistent with that unambiguous part of the 2014 Order, without any deference to the FCC's purported clarification.  If it is consistent, then it is an interpretive rule.  If it is inconsistent, then it is a legislative rule.

If, however, the relevant portion of the 2014 Order is ambiguous, then we analyze the FCC's purported clarification under the *Auer* or *Skidmore* framework.  If the FCC's clarification is entitled to deference, then it is an interpretive rule.  If the FCC's clarification is not entitled to deference, then it is a legislative rule.

If we decide that a clarification is an interpretive rule, then it was properly issued under the 2020 Ruling. We then analyze whether the FCC's purported clarification—even if consistent with the 2014 Order and thus interpretive—survives arbitrary-and-capricious review.

If, on the other hand, a clarification is a legislative rule, we determine whether the legislative rule was properly issued by analyzing whether the FCC followed the APA's procedural requirements and, if it did not, whether the error was harmless.

We use the above framework to analyze all of Petitioners' challenges, except regarding the Express Evidence Requirement. Petitioners argue that the Express Evidence Requirement is a retroactive administrative rule and contrary to law. We thus analyze it by determining whether the Spectrum Act conveys in express terms the power to promulgate retroactive rules and whether the Express Evidence Requirement is retroactive. If the Spectrum Act does not permit retroactive rulemaking and if the Express Evidence Requirement is retroactive, we invalidate it. *See Bahr v. Regan*, 6 F.4th 1059, 1072 (9th Cir. 2021).

## A.  The Commencement of the Shot Clock

The 2014 Order states in relevant part:

(c)  Review of applications. A State or local government may not deny and shall approve any eligible facilities request for modification of an eligible support structure that does not

substantially change the physical dimensions of such structure.

. . . .

(2) Timeframe for review. Within 60 days *of the date on which an applicant submits a request seeking approval under this section*, the State or local government shall approve the application unless it determines that the application is not covered by this section.

(3) Tolling of the timeframe for review. The 60-day period begins to run *when the application is filed*, and may be tolled only by mutual agreement or in cases where the reviewing State or local government determines that the application is incomplete.

47 C.F.R. § 1.6100(c) (emphases added).

The 2020 Ruling notes that 47 C.F.R. § 1.6100(c)(2) "provides that the 60-day review period for eligible facilities requests begins 'on the date on which an applicant *submits a request seeking approval*.'" 2020 Ruling, 35 FCC Rcd. at 5985 (emphasis added) (quoting 47 C.F.R. § 1.6100(c)(2)). "To address uncertainty regarding the commencement of the shot clock," the 2020 Ruling clarified that:

an applicant has effectively submitted a request for approval that triggers the running of the shot clock when it satisfies *both* of the following criteria: (1) the applicant *takes the first procedural step* that the local jurisdiction requires as part of its applicable regulatory review process under section

6409(a), and, to the extent it has not done so as part of the first required procedural step, (2) *the applicant submits written documentation showing that a proposed modification is an eligible facilities request*.

*Id.* at 5986 (second and third emphases added).

The 2020 Ruling explains that the "first step" must be "within the applicant's control" and "objectively verifiable." *Id.* at 5987. Further, the first step "may not [be] . . . a combination or sequencing of steps, rather than a single step." *Id.* For example, if the first step is a meeting with municipal staff, an applicant satisfies the requirement by requesting a meeting, regardless whether the jurisdiction would like the applicant to meet with other individuals. *Id.* But to trigger the 60-day shot clock, the applicant would still need to submit written documentation "showing that the proposed modification is an eligible facilities request." *Id.* at 5986.

We conclude that the Shot Clock Rule is an interpretive rule that did not require notice-and-comment procedures, and that promulgation of the Shot Clock Rule was not arbitrary or capricious.

1.  The Shot Clock Rule Is Interpretive.

"Regulations are interpreted according to the same rules as statutes, applying traditional rules of construction." *Minnick v. Comm'r*, 796 F.3d 1156, 1159 (9th Cir. 2015) (per curiam). "As always, we begin with the text." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457 (2022). "If the regulation is unambiguous, its plain meaning governs." *Amazon.com, Inc. v. Comm'r*, 934 F.3d 976, 984 (9th Cir. 2019). And where a regulation defines a term, we must

follow that definition.  *See Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) ("When a statute includes an explicit definition, we must follow that definition . . . .").

Here, the plain text and canons of statutory interpretation support one, unambiguous interpretation of the shot clock regulations.  To begin, "application" is a defined term in the regulations.  "Siting application or *application* means *a written submission to a siting authority requesting authorization* for the deployment of a personal wireless service facility at a specified location."   47 C.F.R. § 1.6002(j) (emphasis added).   "Deployment means placement, construction, *or modification* of a personal wireless service facility."  *Id.* § 1.6002(h) (emphasis added). These definitions are consistent with the 2020 Ruling, which requires that "the applicant submits written documentation showing that a proposed modification is an eligible facilities request" to trigger the shot clock.  2020 Ruling, 35 FCC Rcd. at 5986.  Though Petitioners argue "an 'application' cannot consist of nebulous 'written documentation,'" we see no daylight between when "the applicant submits written documentation" to a siting authority, *id.*, and when an applicant submits "a written submission to a siting authority," 47 C.F.R. § 1.6002(j).

Further, the context in which the word "application" is used throughout the 2014 Order is consistent with the 2020 Ruling's clarification.  For example, § 1.6100(c)(3) states that the "60-day period begins to run *when the application is filed*." (emphasis added).  But § 1.6100(c)(2) provides that "the State or local government shall approve the application unless it determines that the application is not covered by this section" "[w]ithin 60 days *of the date on which an applicant submits a request* seeking approval under this section." (emphasis added).  Reading the regulation as a

coherent, consistent whole, the date "the application is filed" is the same date "on which an applicant submits a request seeking approval under this section."   § 1.6100(c)(2)–(3). This language is unambiguous.

Under the 2020 Ruling, the 60-day shot clock does not begin to run until "the applicant submits written documentation showing that a proposed modification is an eligible facilities request."   2020 Ruling, 35 FCC Rcd. at 5986.   At that point, so long as the applicant has taken the first procedural step required by the jurisdiction, the application has been filed. *Id.*   This is consistent with the 2014 Order, and also makes practical sense.   If a local government wants a specific form filled out at the beginning of the application process, or if it wants applications sent through a specific channel (such as online or to a designated physical or email address), the locality can enforce those requirements by incorporating them in the locality's first required procedural step.   Submitting the required form with written documentation that supports eligibility would then start the shot clock.   But if a locality would rather meet with an applicant before having the applicant fill out the form, that applicant has filed his application when he requests the meeting *and also* submits or "file[s]" his "written submission to a siting authority requesting authorization" for the modification. *See* 47 C.F.R. §§ 1.6002(j), 1.6100(c)(3). A locality cannot delay the shot clock by requiring a specific form, but first making an applicant jump through other procedural hoops to obtain that form. *See* 2020 Ruling, 35 FCC Rcd. at 5985 (explaining that siting authorities could "effectively postpone the date on which they consider eligible facilities requests to be duly filed (thereby delaying the commencement of the shot clock) by treating applications as incomplete unless applicants have complied

with time-consuming requirements" such as "meeting with city or county staff, consulting with neighborhood councils, obtaining various certifications, or making presentations at public hearings").

Petitioners argue that, as a result of the 2020 Ruling, applicants "may or may not include the information needed to properly evaluate the request otherwise required by local codes and regulations."   But this concern is already addressed in the regulations.  The 2014 Order acknowledged that "State and local governments are best suited to decide what information they need to process an application. Differences between jurisdictions make it impractical for the [FCC] to specify what information should be included in an application."  2014 Order, 29 FCC Rcd. at 12971 (footnote omitted).  The 2020 Ruling is both consistent with the 2014 Order's unambiguous language and preserves the ability of jurisdictions to determine what information they need to process applications by allowing those jurisdictions to determine what their first required procedural step is.  *See* 2020 Ruling, 35 FCC Rcd. at 5986.  If a jurisdiction needs specific information, it can simply require a specific form that requests that information be filled out as its first required procedural step.

If this form and the submitted written documentation are insufficient, such that an application is incomplete, the 2014 Order provides a procedure—the jurisdiction has 30 days after submission of the application to provide written notice to the applicant of "an initial determination of incompleteness."  2014 Order, 29 FCC Rcd. at 12957; *see also* 47 C.F.R. § 1.6100(c)(3)(i)–(iii).   The 60-day timeframe is then tolled and would "begin running again when the applicant makes a supplemental submission." 2014 Order, 29 FCC Rcd. at 12957.  If the application was

still incomplete, the siting authority could toll the timeframe again by providing written notice to the applicant "within 10 days." *Id.* This formal process to determine whether an application is complete within the 60-day shot clock is consistent with the 2020 Ruling's determination that the shot clock begins running when the applicant takes the first procedural step and submits written documentation showing that a proposed modification is an eligible facilities request. In sum, if the jurisdiction needs specific information, it can ask for it in a form as its first procedural step. And if an application is incomplete, the regulations provide procedures to remedy the deficiency while the shot clock is tolled.

We hold that the 2014 Order is unambiguous as to the Shot Clock Rule, and thus we need not afford the FCC's interpretation any deference. *See Kisor*, 588 U.S. at 573. The Shot Clock Rule under the FCC's 2020 Ruling is consistent with the unambiguous text of the 2014 Order. The clarification regarding the shot clock was an interpretive rule that did not require notice-and-comment procedures.

   2.   The Shot Clock Rule Is Not Arbitrary and
        Capricious.

Petitioners contend that the 2020 Ruling's clarifications regarding the Shot Clock Rule were arbitrary and capricious because the 2020 Ruling lacked a reasoned explanation and because the FCC failed to consider evidence that incomplete applications were the cause of many delays. "Judicial review under [the arbitrary-and-capricious] standard is deferential . . . ." *Prometheus Radio Project*, 592 U.S. at 423. "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has

reasonably considered the relevant issues and reasonably explained the decision." *Id.*

The FCC easily satisfies this standard here. The FCC explained that the shot clock clarification was necessary to prevent localities from "effectively postpon[ing]" the shot clock. *See* 2020 Ruling, 35 FCC Rcd. at 5985. As the FCC explained, some jurisdictions had required applicants "to obtain clearance from numerous, separate municipal departments, which could make it difficult to ascertain whether or when the shot clock has started to run." *Id.* This explanation exceeds the "minimal explanation" required to justify a change in policy. *See Rancheria v. Jewell*, 776 F.3d 706, 714 (9th Cir. 2015).

As for Petitioners' concerns regarding incomplete applications, the problem that the agency identified—in both the 2014 Order and the 2020 Ruling—was not applicants' unwillingness to comply with reasonable procedural requirements, but localities' imposition of unreasonable ones. *See* 2014 Order, 29 FCC Rcd. at 12955; 2020 Ruling, 35 FCC Rcd. at 5986. The FCC therefore did not err in declining to consider alternative solutions that did not address the problem it had identified. *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 51 (1983) ("Nor do we broadly require an agency to consider all policy alternatives in reaching decision."). Because the clarification was both "reasonable and reasonably explained," the clarification was neither arbitrary nor capricious. *See Prometheus Radio Project*, 592 U.S. at 423. Accordingly, we deny the petition as to the Shot Clock Rule.

## B.    The Separation Clause

The Tower Height Provision, which includes the Separation Clause, states:

> A modification substantially changes the physical dimensions of an eligible support structure if . . . :

> For towers other than towers in the public rights-of-way, it increases the height of the tower by more than 10% or *by the height of one additional antenna array with separation from the nearest existing antenna not to exceed twenty feet*, whichever is greater [(the Separation Clause)]; for other eligible support structures, it increases the height of the structure by more than 10% or more than ten feet, whichever is greater[.]

47 C.F.R. § 1.6100(b)(7)(i) (emphasis added).

The 2020 Ruling clarified that the phrase "separation from the nearest existing antenna" means the space between the antennas—i.e., "the distance from the top of the highest existing antenna on the tower to the *bottom* of the proposed new antenna to be deployed above it." 2020 Ruling, 35 FCC Rcd. at 5990.

The Separation Clause is unambiguous and supports the FCC's interpretation in the 2020 Ruling. Thus, the 2020 Ruling's clarification of the Separation Clause is an interpretive rule.

The 2014 Order sets a threshold for a change to be considered substantial at "the height of one additional antenna array," qualified by the limitation "with separation

from the nearest existing antenna not to exceed twenty feet." 47 C.F.R. § 1.6100(b)(7)(i). Petitioners argue that the FCC's clarification does not account for the height added by the antenna, which is typically between four and eight feet tall. They claim that the maximum height for one extension is also the cumulative limit for all modifications. One group of Petitioners frames their interpretation of the 2014 Order as providing that "a tower could grow by 10% or 20 feet— but no taller." But if Petitioners' reading of the 2014 Order were correct, 47 C.F.R. § 1.6100(b)(7)(i) could have been rewritten as: "A modification substantially changes the physical dimensions of an eligible support structure if it increases the height of the tower by more than 10% or twenty feet, whichever is greater." In other words, the phrase "by the height of one additional antenna array with separation from the nearest existing antenna not to exceed" would be redundant and unnecessary. The rule against surplusage generally prohibits us from interpreting the regulation in a way that "mak[es] a part of it unnecessary." *NLRB v. Aakash, Inc.*, 58 F.4th 1099, 1105 (9th Cir. 2023). Further, the FCC clearly knew how to craft the regulation to communicate Petitioners' desired interpretation, as it did in the clause following the Separation Clause. *See* 47 C.F.R. § 1.6100(b)(7)(i) ("[F]or other eligible support structures, it increases the height of the structure by more than 10% or more than ten feet, whichever is greater.").

The FCC and the Industry Intervenors argue that "separation" means the "intervening space" or "gap" between the two antennas. (quoting *Separation*, Merriam-Webster, https://www.merriam-webster.com/dictionary/separation (last visited July 30, 2024)). We agree that this is the plain and unambiguous meaning of the Separation Clause. Therefore, what must not exceed twenty feet is the

distance between the top of an existing antenna array and the bottom of a new antenna array.

Petitioners argue that the FCC's interpretation "would frustrate an ascertainable cumulative height limit." But the interpretation can still be mathematically ascertainable for determining a cumulative height limit even if it does not *solely* use fixed numeric terms such as "10%" or "twenty feet." It is still an "objective" standard, as required by the 2014 Order. 2014 Order, 29 FCC Rcd. at 12944 (noting the "adopt[ion]" of "an objective standard"). Under the 2020 Ruling's interpretation of the Separation Clause, there are two ways a modification can avoid being deemed a substantial change: (1) not increase the height of the tower by more than 10%, or (2) not place another antenna array more than twenty feet above the nearest existing antenna. 2020 Ruling, 35 FCC Rcd. at 5989–90. The first way looks holistically at the tower, only calculating its height. The second way looks specifically at the modification, checking to ensure there is not more than a twenty-feet gap between the end of the existing antenna array and the beginning of the new antenna array. Of those two calculations, the modification need only satisfy "whichever is greater." 47 C.F.R. § 1.6100(b)(7)(i).

Petitioners also argue that this reading of the Separation Clause would "open[] a loophole for successive modifications," that is, "[s]uccessive replacements with ever-longer antennas [that] incrementally increase the overall height so long as the bottom of the highest antennas maintain no more than a 20-foot separation from the lower antennas." But the 2020 Ruling's interpretation merely clarified the *size* of the threshold in the Separation Clause in 47 C.F.R. § 1.6100(b)(7)(i)—the interpretation did not address whether that limit was cumulative. The 2014 Order,

moreover, contemplated Petitioners' concern, stating that "[the FCC] agree[s] . . . that our substantial change criteria for changes in height should be applied as limits on cumulative changes; *otherwise, a series of permissible small changes could result in an overall change that significantly exceeds our adopted standards*."  29 FCC Rcd. at 12948 (emphasis added).  The codified rules thus provide in 47 C.F.R. § 1.6100(b)(7)(i)(A) (the subsection right after the Tower Height Provision that includes the Separation Clause):

> Changes in height should be measured from the original support structure in cases where deployments are or will be separated horizontally, such as on buildings' rooftops; in other circumstances, changes in height should be measured from the dimensions of the tower or base station, inclusive of originally approved appurtenances and any modifications that were approved prior to the passage of the Spectrum Act.

In short, the 2014 Order required that successive height modifications be measured from the original tower or base station.  *See* 2014 Order, 29 FCC Rcd. at 12948.

Finally, Petitioners appear to argue that the FCC's clarification of "separation" is a de facto amendment to existing legislative rules.  We disagree because "[a] rule does not . . . become an amendment merely because it supplies crisper and more detailed lines than the authority being interpreted." *Am. Mining Cong.*, 995 F.2d at 1112.

We also find that the FCC's interpretation is neither arbitrary nor capricious.   The FCC's clarification is

reasonable and consistent with that unambiguous part of the 2014 Order.  We may consider the reasonableness of the FCC's interpretation "as a matter of policy."  *M&T Farms v. Fed. Crop Ins. Corp.*, 103 F.4th 724, 730 (9th Cir. 2024). First, we see no reason why the FCC's interpretation is inconsistent with a reasonable interpretation of "substantial change."  Petitioners concede that the additional height added by an antenna "*typically* range between four and eight feet tall." (emphasis added).  Petitioners fail to explain why a threshold of one antenna plus twenty feet (*i.e.*, *typically* between 24 and 28 feet) is a substantial change.  *Cf. Montgomery Cnty. v. FCC*, 811 F.3d 121, 130 n.7 (4th Cir. 2015) (concluding that the categorization of a ten-foot increase to a 37.5-foot utility pole as "insubstantial" was not "an unreasonable interpretation of the term 'substantial'"). Although Petitioners contend that some broadcast antennas can be "several hundred feet tall," they do not point to any evidence that such large antennas are collocated on existing towers, or could be collocated in compliance with structural codes, FAA regulations, and other limitations that continue to apply.  Second, the FCC's interpretation is also reasonable because it interpreted a similar antenna separation standard in the 2001 Collocation Agreement to mean only the distance between two antennas, not the antennas themselves. 2020 Ruling, 35 FCC Rcd. at 5990 & nn.66 & 67.[17]

---

[17] Shortly after the 2001 Collocation Agreement was finalized, it was released by the FCC in a fact sheet.  Wireless Telecommunications Bureau and Mass Media Bureau Announce the Release of a Fact Sheet Regarding the March 16, 2001 Antenna Collocation Programmatic Agreement ("Fact Sheet"), 17 FCC Rcd. 508 (Jan. 10, 2002).  The Fact Sheet stated that "the tower height may be increased by up to 20 feet *plus the height of a new antenna to be located at the new top of the tower*."

Therefore, we deny the petition for review as to the 2020 Ruling's clarification of the Separation Clause.

## C.  The Equipment Cabinet Provision Clarifications

The Equipment Cabinet Provision states:

> A modification substantially changes the physical dimensions of an eligible support structure if . . . :
>
> . . . .
>
> For any eligible support structure, it involves installation of more than the standard number of new equipment cabinets for the technology involved, but not to exceed four cabinets; or, for towers in the public rights-of-way and base stations, it involves installation of any new equipment cabinets on the ground if there are no pre-existing ground cabinets associated with the structure, or else involves installation of ground cabinets that are more than 10% larger in height or overall volume than any other ground cabinets associated with the structure[.]

47 C.F.R. § 1.6100(b)(7)(iii).

The 2020 Ruling clarified the Equipment Cabinet Provision in two ways.  First, the 2020 Ruling clarified that "the maximum number of additional equipment cabinets that can be added under the rule is measured for each separate

---

*Id.* at 513 (emphasis added).  And when adopting the 2014 Order, the FCC expressly incorporated "the [2001] Collocation Agreement's height and width criteria . . . . . for towers."  2014 Order, 29 FCC Rcd. at 12946.

eligible facilities request."   2020 Ruling, 35 FCC Rcd. at 5992.  Second, the 2020 Ruling clarified that, consistent with industry usage and the structure of the rules, "equipment cabinets" refers only to "physical containers for smaller, distinct devices," and not to "transmission equipment manufactured with outer protective covers."  *Id.* at 5991–92 & n.81.

1.  The FCC's Clarification Regarding Cabinet Limits Is Consistent with the 2014 Order's Unambiguous Text.

The plain text of the 2014 Order is unambiguous and supports the FCC's interpretation in the 2020 Ruling.  The 2014 Order provides that "*[a] modification* substantially changes the physical dimensions of an eligible support structure if . . . *it* involves installation of more than the standard number of new equipment cabinets for the technology involved, but not to exceed four cabinets."  47 C.F.R. § 1.6100(b)(7)(iii) (emphases added).  In the 2020 Ruling, the FCC rejected the interpretation that "the term 'not to exceed four cabinets' in section 1.6100(b)(7)(iii) [was] 'setting a cumulative limit, rather than a limit on the number of cabinets associated with a particular eligible facilities request.'"  35 FCC Rcd. at 5992.  It explained that to interpret the four-cabinet limit as cumulative "ignores the fact that the word 'it' in the rule refers to a 'modification'" of an eligible support structure.  *Id.*  Because "it" in the provision refers to "a modification," the regulation contemplates a per-modification cabinet limit, rather than a cumulative limit.  We agree that this interpretation comports with the regulation's unambiguous text.

Petitioners argue that the FCC's interpretation is foreclosed because the 2014 Order interpreted the Tower

Height Provision to impose a cumulative limit on height increases. But under the meaningful-variation canon, which provides that "[w]here a document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea," *Saxon*, 596 U.S. at 457–58 (alteration omitted) (quoting A. Scalia & B. Garner, Reading Law 170 (2012)), this point supports rather than contradicts the FCC's reading. In the context of *height* increases, the 2014 Order states that "our substantial change criteria . . . should be applied *as limits on cumulative changes*; otherwise, a series of permissible small changes could result in an overall change that significantly exceeds our adopted standards." 2014 Order, 29 FCC Rcd. at 12948 (emphasis added). Because the FCC expressly imposed a cumulative limit on the height provision, the absence of an express cumulative limit on the Equipment Cabinet Provision indicates that there is no such limit. *Cf. Badgerow v. Walters*, 596 U.S. 1, 11 (2022) ("When Congress includes particular language in one section of a statute but omits it in another section of the same Act, [we] generally take[] the choice to be deliberate." (alteration and internal quotation marks omitted)).

Petitioners argue that the term "[b]ut not to exceed" "can impose a superseding cap on individual requests." (quoting *Univ. of Texas M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 985 F.3d 472, 481, n.5 (5th Cir. 2021)). It is true that there is a superseding cap on the number of cabinets. It is just not the one that Petitioners claim.

The phrase "not to exceed four cabinets" qualifies the otherwise undefined "standard number of new equipment cabinets for the technology involved." 47 C.F.R. § 1.6100(b)(7)(iii). The FCC explained in the 2020 Ruling

that the rule limits each modification to "the *standard number* of new equipment cabinets for the technology involved," and therefore Petitioners' fears of unlimited equipment cabinets were unwarranted. 2020 Ruling, 35 FCC Rcd. at 5993 (emphasis added) (quoting 47 C.F.R. § 1.6100(b)(7)(iii)). For example, if the "standard number of new equipment cabinets for the technology involved" is six on a one-hundred-foot tower, then the four-cabinet limit works as the overall ceiling on the number of equipment cabinets that can be added to a support structure before the modification would count as a substantial change. But if the "standard number of new equipment cabinets for the technology" was only two cabinets, then that standard number would be the limit.

At oral argument, we asked the FCC whether an applicant for equipment cabinet modifications could engage in something akin to "splitting,"[18] such as by spacing out eight equipment cabinets for the same technology into two applications to avoid the limits under the Equipment Cabinet Provision. The FCC conceded that nothing would stop a city or other local government from treating these applications together, thus turning them into a "substantial change." Oral Arg. 33:20–34:44. We agree that the FCC's clarifications in the 2020 Ruling do not impinge on a reviewing authority's power to recognize attempts to artificially evade the

---

[18] "Splitting" in the procurement context refers to the intentional breaking down of a known requirement to stay within a purchase limit or to avoid other procurement methods or competition requirements. *See, e.g.*, Army Federal Acquisition Regulation Supplement § 14-5(a), https://www.acquisition.gov/afars/14-5.-split-purchases (last visited July 30, 2024).

"substantial modification" label in the equipment cabinet context.

Petitioners also argue that the FCC's per-modification-request limit would violate the 2014 Order's mandate that modifications be measured against the *existing* tower or base station. But the 2014 Order noted that "the term 'existing' requires that wireless towers or base stations have been reviewed and approved under the applicable *local* zoning or siting process or . . . another form of affirmative *State or local* regulatory approval." 2014 Order, 29 FCC Rcd. at 12937 (emphasis added); *see also* 47 C.F.R. § 1.6100(b)(5) ("A constructed tower or base station is existing for purposes of this section if it has been reviewed and approved under the applicable zoning or siting process, or under another State or local regulatory review process . . . ."). Petitioners' concern is that the 2020 Ruling's clarification "would measure the number of new equipment cabinets against the most recent *federally mandated* approval under [s]ection 6409(a), not against the existing facility as it had been reviewed and approved under State or local siting authority."

This argument is unavailing. While the 2014 Order defines "existing" to mean that the facility "has been reviewed and approved under the applicable zoning or siting process, or under another State or local regulatory review process," 47 C.F.R. § 1.6100(b)(5), it does not follow that a structure is *not* "existing" after it is "modified by one or more previous modifications only made under [s]ection 6409(a)'s *federal* process." A facility reviewed and approved through a local process and subsequently *modified* pursuant to section 6409 was still reviewed and approved through a local process.

Because the Equipment Cabinet Provision is unambiguous as to cabinet limits and consistent with the 2020 Ruling's clarification, the clarification is an interpretive rule. The FCC's clarification also survives arbitrary-and-capricious review. *Prometheus Radio Project*, 592 U.S. at 423.Thus, we deny the petition for review as to the 2020 Ruling's clarification of the cabinet limits.

2.  The FCC's Clarification Regarding the Definition of an Equipment Cabinet Is Consistent with the 2014 Order's Unambiguous Text.

Petitioners also challenged the FCC's clarification regarding the definition of an equipment cabinet. In the 2020 Ruling, the FCC clarified:

> We conclude that localities are interpreting "equipment cabinet" under section 1.6100(b)(7)(iii) too broadly to the extent they are treating equipment itself as a cabinet simply because transmission equipment may have protective housing. Nor does a small piece of transmission equipment mounted on a structure become an "equipment cabinet" simply because it is more visible when mounted above ground. Consistent with common usage of the term "equipment cabinet" in the telecommunications industry, small pieces of equipment such as remote radio heads/remote radio units, amplifiers, transceivers mounted behind antennas, and similar devices are not "equipment cabinets" under section 1.6100(b)(7)(iii) if they are not

> used as physical containers for smaller, distinct devices.

35 FCC Rcd. at 5991–92 (footnote omitted).

Petitioners disagree and would have the term mean a cabinet *around* equipment—no matter its size, or "simply an enclosure or shielding of single piece of equipment." Petitioners argue that, in light of the cabinet limits before a modification is considered a substantial change (as we discussed above), the FCC's narrower definition of an "equipment cabinet" fails to "consider[] the impact of its decision on the substantiality of changes that would be permitted."  Petitioners note that "the record included pictures that showed poles and ground areas where equipment and cabinetry were allowed to proliferate, and also included (before and after) pictures of facilities where proposed installations were altered so that all parts of the facility could be concealed within a single box which fits on one side of a utility pole."  In other words, Petitioners contend that allowing the FCC to count *that* box as one equipment cabinet (of up to four that can be added to an eligible support structure in one application without it being deemed a substantial modification) could exponentially increase the *amount* of equipment and cabling on any existing tower.

But Petitioners do not dispute that the FCC's definition of "equipment cabinet" is consistent with usage in the industry and the structure of the rules, as the FCC found. *Id.* ("Consistent with common usage of the term 'equipment cabinet' in the telecommunications industry, small pieces of equipment such as remote radio heads/remote radio units, amplifiers, transceivers mounted behind antennas, and similar devices are not 'equipment cabinets' under

[§] 1.6100(b)(7)(iii) if they are not used as physical containers for smaller, distinct devices."). Instead, Petitioners' argument is solely focused on the FCC's supposed failure to consider "the substantiality of changes."

The FCC's interpretation is consistent with evidence on the record of industry practice, as well as the ordinary meaning of "cabinet." *See Cabinet*, Merriam-Webster, https://www.merriam-webster.com/dictionary/cabinet (last visited July 30, 2024) (defining a "cabinet" as "a case or cupboard usually having doors and shelves"). The protective covering manufactured on a piece of equipment is not a "cabinet." Thus, the FCC's clarification regarding the Equipment Cabinet Provision is an interpretive rule and is not arbitrary and capricious. Therefore, we deny the petition as to the two challenges to the Equipment Cabinet Provision.

## D.  The Concealment and Siting Approval Conditions Provisions

As noted above, the 2020 Ruling clarified the differences between the "concealment elements" in the Concealment Provision and the other "conditions to minimize the visual impact of non-stealth facilities," which are "separately address[ed]" under the Siting Approval Conditions Provision at 47 C.F.R. § 1.6100(b)(7)(vi). 2020 Ruling, 35 FCC Rcd. at 5995.

The Concealment Provision provides:

> A modification substantially changes the physical dimensions of an eligible support structure if . . . :
>
> . . . .

It would defeat the concealment elements of the eligible support structure[.]

47 C.F.R. § 1.6100(b)(7)(v).

The Siting Approval Conditions Provision provides:

A modification substantially changes the physical dimensions of an eligible support structure if . . . :

It does not comply with conditions associated with the siting approval of the construction or modification of the eligible support structure or base station equipment, provided however that this limitation does not apply to any modification that is non-compliant only in a manner that would not exceed the thresholds identified in [47 C.F.R. § 1.6100(i)–(iv)].

*Id.* § 1.6100(b)(7)(vi). As discussed above, the distinction between these two provisions is significant because "concealment elements" are afforded greater protection than "conditions associated with the siting approval," which conditions can be overcome if the proposed modification is insubstantial under 47 C.F.R. § 1.6100(b)(7)(i)–(iv).

The 2014 Order stated that "in the context of . . . concealed or 'stealth'-designed facilities—*i.e.*, facilities designed to look like some feature other than a wireless tower or base station—any change that defeats the *concealment elements* of such facilities would be considered a 'substantial change' under [s]ection 6409(a)." 2014 Order, 29 FCC Rcd. at 12950 (emphasis added). The 2020 Ruling clarified that the "concealment elements are elements of a stealth-designed facility intended to make the facility look

like something other than a wireless tower or base station," such as a "pine tree, flag pole, or chimney." 2020 Ruling, 35 FCC Rcd. at 5994, 5996. These concealment elements are "defeated" when "the proposed modification . . . cause[s] a reasonable person to view the structure's intended stealth design as no longer effective after the modification," *id.* at 5996, such as by making a facility that was originally constructed to look like a tree no longer resemble a tree.

The 2020 Ruling clarified that other "conditions to minimize the visual impact of non-stealth facilities," which are "separately address[ed]" under the Siting Approval Conditions Provision at 47 C.F.R. § 1.6100(b)(7)(vi), are to be distinguished from the concealment elements under the Concealment Provision at 47 C.F.R. § 1.6100(b)(7)(v). *Id.* at 5995. The 2020 Ruling offered several examples to "provide guidance on . . . whether or not [concealment elements] have been defeated." *Id.* at 5997. According to the FCC, even if an original design element, *and* a condition of approval, was that a facility needed to be completely concealed by being entirely hidden (for example, behind a tree line) or set back on a roof so that it could not be seen, such elements were *not* concealment elements and may *not* be enforced under the Concealment Provision. *See id.* at 5997–98.

Such requirements may be enforceable under the Siting Approval Conditions Provision, but only if the proposed modification does not constitute an insubstantial change under 47 C.F.R. §§ 1.6100(b)(7)(i)–(iv), in which case the modification can override the condition of siting approval. In other words, a stealth-designed monopine may become entirely visible by "increas[ing] the height . . . by . . . 10%," 47 C.F.R. § 1.6100(b)(7)(i), *and* "adding an appurtenance . . . that would protrude from the edge of the

tower" by an additional twenty feet, *id.* § 1.6100(b)(7)(ii), but the original requirement that the monopine remain hidden behind a tree line may *not* be enforced under the Siting Approval Conditions Provision.

Petitioners challenge the 2020 Ruling's interpretation of both the Concealment and Siting Approval Conditions Provisions. They argue that, under the 2020 Ruling, (1) "the [FCC] . . . conclude[d] that not all concealment should receive protection"; and (2) "[t]he [FCC]'s reversal on [the Siting Approval Conditions Provision] amounts to a constructive amendment that . . . should [be] invalidate[d] as procedurally improper under the APA." We agree. The clarifications regarding the Concealment and Siting Approval Conditions Provisions are legislative rules because they are inconsistent with the unambiguous text of the 2014 Order.

Petitioners read the 2020 Ruling as impermissibly "excluding concealment elements from protection unless specifically designed to make the tower or base station look like something other than a wireless facility." We first look at the 2014 Order using traditional tools of construction. The word "'[c]onceal' is not a term of art." *United States v. Katakis*, 800 F.3d 1017, 1028 (9th Cir. 2015) (interpreting 18 U.S.C. § 1519). It is unambiguous and so we must give the word its plain meaning. *Id.* We have defined "conceal":

> "Conceal" means "to prevent disclosure or recognition of; avoid revelation of; refrain from revealing recognition of; draw attention from; *treat so as to be unnoticed; to place out*

> *of sight; withdraw from being observed; shield from vision or notice.*"

*Id.* (emphasis added) (quoting Webster's Third New International Dictionary (1993)).  Following the broadness of that definition, a concealment element is naturally read as an element that "treat[s] [the eligible support structure] so as to be unnoticed," "place[s] [it] out of sight," and/or "shield[s] [it] from vision or notice."  *Id.*

Only two limitations on "concealment elements" appear in the plain text of the regulation and the 2014 Order: the concealment elements must be "existing," and they must be "of the eligible support structure."  The 2014 Order defines an "eligible support structure" broadly to include the structure and, in some cases, the equipment associated with it.  *See, e.g.*, 47 C.F.R. § 1.6100(b)(1)(ii), (b)(4) (providing that "eligible support structure" includes a "base station," which in turn includes "radio transceivers, antennas, coaxial or fiber-optic cable, regular and backup power supplies, and comparable equipment").

The FCC argues that the phrase "concealment elements *of the eligible support structure*" in the Concealment Provision limits the concealment elements to those physically located *on* the eligible support structure (in contrast to other features of an eligible support structure). But this explanation does not appear in the 2020 Ruling. We thus cannot consider it.  *See Transp. Div.*, 988 F.3d at 1178 (limiting judicial review of agency action "to the grounds that the agency invoked when it took the action").

In any event, this view relies on an unreasonably narrow interpretation of the term "element" that is not borne out by how "element" is used as a term of art.  *See, e.g.*, 47 U.S.C.

§ 153(35) (defining, for purposes of the Communications Act of 1934, "network *element*" to mean "a facility or equipment used in the provision of a telecommunications service," which "includes *features, functions, and capabilities* that are provided by means of such facility or equipment" (emphasis added)).  For example, San Francisco requires rooftop concealment elements that include a required "setback" of a facility from the edge of a building's roof, which can render the facility invisible from the sidewalk below.  This setback requirement is naturally read as an "element" of the support structure as conceived and approved, because it forms "a constituent part" of the whole entity.  *Element*, Merriam-Webster, https://www.merriam-webster.com/dictionary/element (last visited July 30, 2024).  Even were we to look to the FCC's argument made for the first time in its brief and in the brief of the Industry Intervenors, the setback requirement is a restriction *of the base station and its equipment* that renders it effectively invisible from a common viewpoint.  It would strain the plain language of the 2014 Order to find that an element that conceals in this fashion is nevertheless not a concealment element.

The FCC also relies on the second sentence in the following passage from the 2014 Order:

> [W]ireless industry and municipal commenters . . . generally agree that a modification that undermines the concealment elements of a stealth wireless facility, such as painting to match the supporting facade or artificial tree branches, should be considered substantial under [s]ection 6409(a).  We agree with

> commenters that in the context of a modification request related to *concealed or "stealth"-designed facilities—i.e., facilities designed to look like some feature other than a wireless tower or base station*—any change that defeats the concealment elements of such facilities would be considered a "substantial change" under [s]ection 6409(a).

2014 Order, 29 FCC Rcd. at 12949–50 (emphasis added) (footnote omitted).

The FCC argues that "concealed or 'stealth'-designed facilities" should be treated as a "unified whole." (quoting *Facebook, Inc. v. Duguid*, 592 U.S. 395, 403 (2021)). As the FCC recognizes, this would treat "concealed" and "stealth-designed" as synonyms. But the FCC did not treat them synonymously. The 2014 Order uses "stealth wireless facility,"[19] 2014 Order, 29 FCC Rcd. at 12950, showing that the FCC knew when to use the word "stealth" as a standalone, and leading naturally to the implication that if the *very next* sentence used the disjunctive form "concealed *or* 'stealth'-designed facilities," *id.* (emphasis added)— which it did—the FCC meant to refer to them separately.

What follows "'stealth'-designed facilities" supports this reading. The clause in between the dashes—"*i.e.*, facilities designed to look like some feature other than a wireless tower or base station," *id.*—begins with "*i.e.*" or "that is." The word "that" in "that is" indicates a relative clause. Under the last antecedent rule, "a limiting clause or

---

[19] Indeed, the full phrase is "undermines the concealment elements *of* a stealth wireless facility," 2014 Order, 29 FCC Rcd. at 12950 (emphasis added), further undermining the FCC's argument.

phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). The noun that this relative clause immediately follows is "stealth-designed facilities" and, therefore, "facilities designed to look like some feature other than a wireless tower or base station" describes only "'stealth'-designed facilities" and not "concealed" facilities.

Finally, the FCC makes a rule-against-surplusage argument. It contends that "'conditions' under [the Siting Approval Conditions Provision] include 'conditions' that address a site's visual impact, such as 'fencing' and 'height or width increases,'" and thus the "'concealment elements' [under the Concealment Provision] cannot include *all* conditions that can obscure a facility from view, because the provisions would then be redundant at least as to fencing and size." (quoting 2014 Order, 29 FCC Rcd. at 12950). The FCC contends that that interpretation would render "conditions" covered by the Siting Approval Conditions Provision "devoid of meaningful effect." That is not so.

Many fencing, height and width, and location requirements could be "conditions" under the Siting Approval Conditions Provision but would not also be "concealment elements" under the Concealment Provision. For instance, fall zone requirements "define the area where a tower would collapse in the event of a catastrophic failure." Such requirements are conditions based on height and location but are unrelated to concealment. Similarly, a fencing requirement may be needed to protect public safety, rather than to conceal the facility.

While some concealment elements could also fall within the scope of the Siting Approval Conditions Provision, this potential overlap does not support the 2020 Ruling's

narrowing of the scope of concealment elements in the Concealment Provision beyond its *unambiguous* meaning. "[I]t is a commonplace of statutory construction that the specific governs the general." *Morales*, 504 U.S. at 384. Narrowing the more-specific Concealment Provision beyond its plain meaning, to avoid any potential for overlap with the more-general Siting Approval Conditions Provision, violates this basic principle of construction. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (explaining that when "a general authorization and a more limited, specific authorization exist side-by-side," "[t]he terms of the specific authorization must be complied with").

Before finding ambiguity, we must "exhaust all the traditional tools of construction." *Kisor*, 588 U.S. at 575 (internal quotation marks omitted). Doing so shows that the regulation is unambiguous, and that the FCC's purported clarifications are inconsistent with the 2014 Order. The clarifications regarding the Concealment and Siting Approval Conditions Provisions are therefore legislative rules.

### E.    The Express Evidence Requirement

As discussed above, the 2014 Order provides:

> A modification substantially changes the physical dimensions of an eligible support structure if . . . :
>
> . . . .
>
> (v) It would defeat the concealment elements of the eligible support structure [the "Concealment Provision"]; or

(vi) It does not comply with conditions associated with the siting approval of the construction or modification of the eligible support structure or base station equipment, provided however that this limitation does not apply to any modification that is non-compliant only in a manner that would not exceed the thresholds identified in [47 C.F.R. § 1.6100(b)(7)(i)–(iv)] [the "Siting Approval Conditions Provision"].

47 C.F.R. § 1.6100(b)(7)(v)–(vi).

The 2020 Ruling clarifies that an element is a "concealment element" only if "there [is] *express evidence* in the record to demonstrate that a locality considered in its approval that a stealth design for a telecommunications facility would look like something else." 2020 Ruling, 35 FCC Rcd. at 5995–96 (emphasis added). The FCC explained that the requirement "does not mean that a concealment element must have been explicitly articulated," and that "specific words or formulations are not needed." *Id.* at 5996.

The 2020 Ruling similarly clarifies that "localities cannot merely assert that a detail or feature of the facility was a condition of the siting approval; there must be *express evidence* that at the time of approval the locality required the feature and conditioned approval upon its continuing existence." *Id.* at 5998 (emphasis added). The FCC further explained that this "clarification is a restatement of the basic principle that applicants should have clear notice of what is required by a condition and how long the requirement lasts." *Id.* at 5998 n.123. "[S]how[ing] that the condition existed at

the time of the original approval" is sufficient to demonstrate such notice.  *Id.*

Petitioners argue that these clarifications are impermissibly retroactive because they impose additional record-keeping or evidentiary burdens on localities' prior siting approvals.

Because we find that the "clarifications" of the distinction between Concealment Elements and Siting Approval Conditions Provisions were legislative rules above, the import of the Express Evidence Requirement clarification—tied to the definition of "concealment element"—is diminished.  But no one has argued that if we rejected the FCC's interpretation of "concealment element," we need not consider the propriety of the Express Evidence Requirement clarification.  That requirement, after all, still applies to enforcement of the Siting Approval Conditions Provision.  *Id.*  Thus, we review this portion of the 2020 Ruling, and we conclude that the Express Evidence Requirement is not retroactive.

As noted above, we use a different framework to analyze whether the Express Evidence Requirement is impermissibly retroactive.  "If the statute [or regulation] would operate retroactively, our traditional presumption teaches that it does not govern."  *Bahr v. Regan*, 6 F.4th 1059, 1072 (9th Cir. 2021) (alteration in original) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994)). This presumption against retroactivity does not apply where Congress has expressly prescribed that a statute or regulation applies retroactively.  *Id.*  And the presumption can apply only if "application of the regulation would have a retroactive effect."  *Id.* (quoting *Mejia v. Gonzales*, 499 F.3d 991, 997 (9th Cir. 2007)).  To determine whether a

regulation would have a retroactive effect, it is not enough that the regulation "is applied in a case arising from conduct antedating the statute's enactment," or that the regulation "upsets expectations based in prior law." *Id.* (quoting *Landgraf*, 511 U.S. at 269–70). Instead, a regulation has retroactive effect when it "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *Id.* (quoting *INS v. St. Cyr*, 533 U.S. 289, 321 (2001), *superseded on other grounds by* 8 U.S.C. § 1252(a)(5)). "The conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." *Landgraf*, 511 U.S. at 270.

Applying these principles, we deny the petition as to the Express Evidence Requirement because application of the Express Evidence Requirement would not have retroactive effect. The 2020 Ruling says nothing about the status of siting applications that were approved in the past. Rather, it addresses what evidence a locality must present if it wants to challenge a proposed modification today. Thus, the Express Evidence Requirement is not retroactive because it regulates present conduct.

The FCC's interpretation also makes practical sense. Suppose a tower's construction was approved, and that at that time, the tower was not visible because the top of the tower was below the tree line. If a proposed modification would result in the tower no longer being below the tree line, then this could hypothetically be an impermissible modification under section 6409(a) because it defeats a concealment element. *See* 47 C.F.R. § 1.6100(b)(7)(v). The

question, however, is whether the tower top's placement below the tree line was truly a "concealment element" or a mere coincidence coupled with a post hoc objection.

The 2020 Ruling explains that a locality must provide "express evidence" if it wants to assert that an element is a "concealment element." 2020 Ruling, 35 FCC Rcd. at 5996. But the 2020 Ruling also explains that the requirement "does not mean that a concealment element must have been explicitly articulated," and that "specific words or formulations are not needed." *Id.* "[S]how[ing] that the condition existed at the time of the original approval" is sufficient to "demonstrate that the applicant was on notice that noncompliance with the condition could result in disqualification." *Id.* at 5998 n.123. Though the 2020 Ruling clarifies what evidence localities should provide to assert that an element *was* a concealment element under 47 C.F.R. § 1.6100(b)(7)(v), or that approval of the siting application *was* conditioned on the ongoing existence of a certain element under 47 C.F.R. § 1.6100(b)(7)(vi), that does not mean the 2020 Ruling applies retroactively. Instead, the Express Evidence Requirement clarifies what evidence can be used to assert that a concealment element or other condition of siting approval existed at the time of the siting approval, such that a proposed modification would be substantial *today*. Because application of the Express Evidence Requirement does not have a retroactive effect, we deny the petition on this issue.[20]

---

[20] Petitioners contend that the FCC failed to address the retroactive effects of the 2020 Ruling. Because we hold that the Express Evidence Requirement applies prospectively, not retroactively, the requirement is neither arbitrary nor capricious and is well "within a zone of reasonableness." *See Prometheus Radio Project*, 592 U.S. at 423.

## F.  The Propriety of the Legislative Rules

"An agency can issue a legislative rule only by using the notice and comment procedure described in the APA . . . ." *Hemp Indus.*, 333 F.3d at 1087 (emphasis omitted).[21]  These include publication of the proposed rulemaking in the Federal Register and an opportunity for public comment. *See* 5 U.S.C. § 553(b), (c).   Failure to follow these procedures may be excused as harmless error only when "the agency's mistake '*clearly had no bearing* on the procedure used or the substance of decision reached.'"  *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1090 (9th Cir. 2011) (emphasis added) (quoting *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1487 (9th Cir. 1992)).  Because the harmless error rule threatens to "gut[] the APA's procedural requirements," *id.*, we do not find harmless error lightly.

We have found that the FCC's clarifications regarding the Concealment Provision and the Siting Approval Conditions Provision were legislative rules.  We also hold that the FCC did not follow the APA's procedural requirements in issuing these legislative rules through a declaratory ruling, without notice-and-comment procedures required under section 553, and that such failure was not harmless error because we cannot find that the error "clearly had no bearing" on the result.  *Id.*  As discussed in Section I.C, *supra*, some commenters to the 2019 Notice urged the FCC to follow the notice-and-comment procedures under the APA, but the FCC refused.  Instead, the FCC followed its own proceedings on a much-truncated timeline and refused additional time to comment after it published the 2020 Draft Ruling.   Because the FCC did not follow the APA's

---

[21] As noted in Note 14, *supra*, there is an exception that is not at issue here.

procedural requirements, we proceed to analyze whether such failure was harmless.

A "failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure." *Sprint Corp. v. FCC*, 315 F.3d 369, 376 (D.C. Cir. 2003) (quoting *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002)). Here, there is more than sufficient uncertainty.

First, it is uncertain whether the FCC would still have adopted the rules had it received further public comments and criticism about the FCC's proposed clarifications regarding those provisions. We note that both dissenting statements from the 2020 Ruling criticized the FCC majority's decision not to grant requested extensions for further public comment. *See* 35 FCC Rcd. at 6034–35 (Comm'r Rosenworcel, dissenting); *id.* at 6037 (Comm'r Starks, dissenting).

Second, as discussed above, the FCC's decision not to utilize APA procedures has produced clarifications regarding the Concealment Provision and the Siting Approval Conditions Provision under which codified legislative rules do not mean what they say. As dissenting Commissioner Rosenworcel stated, "the FCC adopt[ed] a declaratory ruling that requires every state and local government to immediately review and update their current ordinances, policies, and application systems involving wireless towers." *Id.* at 6034 (Commissioner Rosenworcel, dissenting). This includes "how they conceal structures to preserve the visual character of their communities" under the Concealment and the Siting Approval Conditions Provisions. *Id.* Making these very substantial changes using deficient procedures deprived Petitioners of an opportunity

to criticize the proffered clarifications at a time *before* they were finally adopted.  It is impossible for us to say that the result "clearly" would have been the same if Petitioners, Industry Intervenors, and others had had meaningful notice and a meaningful opportunity to comment on changes of this magnitude.

The FCC and the Industry Intervenors argue that the APA violation was harmless because there are similarities between the FCC's proceedings here and the notice-and-comment procedures required by the APA.  But as the D.C. Circuit noted in *Sprint Corp.*, "broadening the harmless error rule would virtually repeal section 553's requirements":

> [I]f the government could skip those procedures, engage in informal consultation, and then be protected from judicial review unless a petitioner could show a new argument—not presented informally—section 553 obviously would be eviscerated. The government could avoid the necessity of publishing a notice of a proposed rule and perhaps, most important, would not be obliged to set forth a statement of the basis and purpose of the rule, which needs to take account of the major comments—and often is a major focus of judicial review.

315 F.3d at 376–77 (quoting *Sugar Cane Growers*, 289 F.3d at 96–97).  These issues described by the D.C. Circuit are presented here at every turn, and finding the significant APA error to be harmless would indeed work an evisceration of section 553.

Therefore, we find that the legislative rules were improperly issued as part of a declaratory ruling, and we invalidate them.

## V.    CONCLUSION

We **GRANT** the petition for review with respect to the Concealment Provision and the Siting Approvals Condition Provision.  We **DENY** the petition for review with respect to the FCC's clarifications regarding the commencement of the shot clock, the Separation Clause in the Tower Height Provision, the Equipment Cabinet Provision, and the Express Evidence Requirement.[22]

---

BENNETT, Circuit Judge, dissenting in part and concurring in part:

I join the per curiam opinion with respect to the Equipment Cabinet Provision (Section IV.C of the per curiam opinion) and the Concealment Provision (Section IV.D of the per curiam opinion).[1]  I write separately for four reasons.  First, I would grant the petition for review with respect to the Shot Clock Rule.  Second, I would also grant the petition for review with respect to the Express Evidence Requirement.  Third, while I agree that we should deny the petition for review with respect to the Separation Clause in the Tower Height Provision, I would reach that conclusion by finding that the Separation Clause is ambiguous, and that

---

[22] The parties shall bear their own costs.

[1] Unless otherwise noted, I use the same defined terms as the per curiam opinion.

the FCC's clarification [2] is entitled to *Auer* [3] deference. Fourth, I write separately on the Concealment Provision and Siting Approval Conditions Provision to explain that, even were such provisions ambiguous, I would not accord the FCC's clarifications deference.

## I.    The Commencement of the Shot Clock

### A.    The Shot Clock Rule Is Legislative.

The per curiam opinion concludes that "the Shot Clock Rule is an interpretive rule that did not require notice-and-comment procedures."  Per Curiam Op. 34.  I disagree.

The 2014 Order states in relevant part:

> (c) Review of applications. . . .
>
> . . . .
>
> (2) Timeframe for review.  Within 60 days of the date on which an applicant submits a request seeking approval under this section, the State or local government shall approve the application unless it determines that the application is not covered by this section.
>
> (3) Tolling of the timeframe for review. The 60-day period begins to run when the application is filed, and may be tolled

---

[2] Like the per curiam opinion, I use "clarify" or "clarifications" simply to echo the FCC's description of its various rulings.  My use of those words does not indicate agreement that the FCC's actions were simply "clarifications."  *See* Per Curiam Op. 10 n.2.

[3] *Auer v. Robbins*, 519 U.S. 452 (1997).

> only by mutual agreement or in cases where the reviewing State or local government determines that the application is incomplete.

47 C.F.R. § 1.6100(c)(2)–(3).

The 2014 Order further provides:

> [T]he statutory provision requiring a State or local government to approve an "eligible facilities request" implies that the relevant government entity may require an applicant to file a request for approval. Further, nothing in the provision indicates that States or local governments must approve requests merely because applicants claim they are covered. Rather, under [s]ection 6409(a), only requests that do in fact meet the provision's requirements are entitled to mandatory approval. Therefore, *States and local governments must have an opportunity to review applications* to determine whether they are covered by [s]ection 6409(a), and if not, whether they should in any case be granted.

In re Acceleration of Broadband Deployment by Improving Wireless Facilities Siting Policies, 29 FCC Rcd. 12865, 12955 (Oct. 17, 2014) (emphasis added) (footnote omitted).

The 2020 Ruling also states that 47 C.F.R. § 1.6100(c)(2) "provides that the 60-day review period for eligible facilities requests begins 'on the date on which an applicant *submits a request seeking approval*.'" In re

Implementation of State and Local Governments' Obligation to Approve Certain Wireless Facility Modification Requests Under Section 6409(a) of the Spectrum Act of 2012, 35 FCC Rcd. 5977, 5985 (June 10, 2020) (emphasis added) (quoting 47 C.F.R. § 1.6100(c)(2)).

The 2020 Ruling clarified that:

> [F]or purposes of our shot clock and deemed granted rules, an applicant has effectively submitted a request for approval that triggers the running of the shot clock when it satisfies *both* of the following criteria: (1) the applicant takes the first procedural step that the local jurisdiction requires as part of its applicable regulatory review process under section 6409(a), and, to the extent it has not done so as part of the first required procedural step, (2) the applicant submits written documentation showing that a proposed modification is an eligible facilities request.

*Id.* at 5986.

The FCC further clarified that the government entity must *not* establish a "first step" that is "outside of the applicant's control or is not objectively verifiable," and that it "may *not* [be] . . . a combination or sequencing of steps, rather than a single step." *Id.* at 5987 (emphasis added). The FCC provided two examples for this further clarification. First, the FCC stated that "if the first step required by a local government is that applicants meet with municipal staff before making any filing, the applicant should be able to satisfy that first step by making a written request to schedule the meeting—a step within the applicant's control." *Id.*

Thus, "the 60-day shot clock would start once the applicant *has made a written request for the meeting* and the applicant also has satisfied the second of our criteria (documentation)." *Id.* (emphasis added). Second, the FCC stated:

> [I]f a local government defines the first step of its process as separate consultations with a citizens' association, a historic preservation review board, and the local government staff, an applicant will trigger the shot clock by taking any one of those actions, along with satisfying the second of our criteria (documentation).

*Id.*

"Regulations are interpreted according to the same rules as statutes, applying traditional rules of construction." *Minnick v. Comm'r*, 796 F.3d 1156, 1159 (9th Cir. 2015). "As always, we begin with the text." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457 (2022). "If the regulation is unambiguous, its plain meaning governs." *Amazon.com, Inc. v. Comm'r*, 934 F.3d 976, 984 (9th Cir. 2019).

The plain text and canons of statutory interpretation point toward an unambiguous reading. Section 1.6100(c)(2) states that "the State or local government shall approve the application" "[w]ithin 60 days of the date on which an applicant submits a request seeking approval." The 2014 Order often uses the word "application":

> (2) Timeframe for review. Within 60 days of the date on which an applicant submits a request seeking approval under this section,

the State or local government shall approve the *application* unless it determines that the *application* is not covered by this section.

(3) Tolling of the timeframe for review. The 60-day period begins to run when the *application* is filed, and may be tolled only by mutual agreement or in cases where the reviewing State or local government determines that the *application* is incomplete. The timeframe for review is not tolled by a moratorium on the review of *applications*.

47 C.F.R. § 1.6100(c)(2)–(3) (emphasis added); *see also, e.g.*, 2014 Order, 29 FCC Rcd. at 12955 ("As an initial matter, we find, consistent with the [FCC's] proposal, that State or local governments may *require* parties asserting that proposed facilities modifications are covered under [s]ection 6409(a) to *file applications*, and that *these governments may review the applications* to determine whether they constitute covered requests." (emphasis added)).

*Filing an application* would normally be understood to mean formally submitting a request through properly defined channels (such as online or to a specifically designated physical or email address) and in the government-designated format or on the government-prescribed form. *See Application*, Merriam-Webster, https://www.merriam-webster.com/dictionary/application (last visited Aug. 28, 2024) (defining "application" as "a *form* used in making a request." (emphasis added)); *File*, Merriam-Webster, https://www.merriam-webster.com/dictionary/file (last visited Aug. 28, 2024) (defining file as "to place among official records *as prescribed by law*" or "to

initiate (something, such as a legal action) through *proper formal procedure*." (emphasis added)).

The per curiam opinion simply dismisses the 2014 Order's repeated use of "application."  But "statutory language cannot be construed in a vacuum.  It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989).

Both "submit[ting] written documentation" under the 2020 Ruling's second step, 2020 Ruling, 35 FCC Rcd. at 5986, and "ma[king] a written request for [a] meeting," as one example under the 2020 Ruling's first step, *id.* at 5987, are materially different from "fil[ing]" an "application," 47 C.F.R. § 1.6100(c)(3).  Reading the words "request" and "application" together, and in context, unambiguously harmonizes them: "a request seeking approval" filed by "*an applicant*," *id.* § 1.6100(c)(2) (emphasis added), refers to "*the application*," *id.* § 1.6100(c)(2)–(3), and "*the application*" means the formal application required by the government entity.

The FCC stated that its rule was merely interpretive because the 2014 Order "does not . . . define the date on which an applicant is deemed to have submitted an eligible facilities request for purposes of triggering the 60-day shot clock." 2020 Ruling, 35 FCC Rcd. at 5985.  But the 2014 Order stated and acknowledged that "local governments are best suited to decide what information they need to process *an application*.  Differences between jurisdictions make it impractical for the [FCC] to specify what information should be included *in an application*." 2014 Order, 29 FCC Rcd. at 12971 (emphasis added).  The 2014 Order also declares—

multiple times—that the 60-day period commences on "the date of filing" of an application.**4**

---

4 *See* 2014 Order, 29 FCC Rcd. at 12875 ("Within *60 days from the date of filing*, accounting for tolling, a State or local government shall approve an application covered by [s]ection 6409(a)[.]" (emphasis added)); *id.* at 12957 ("[I]f an application covered by [s]ection 6409(a) has not been approved by a State or local government within *60 days from the date of filing*, accounting for any tolling, as described below, the reviewing authority will have violated [s]ection 6409(a)'s mandate to approve and not deny the request, and the request will be deemed granted." (emphasis added)); *id.* at 13010 ("[W]ithin *60 days from the date of filing* (accounting for tolling), a State or local government shall approve an application covered by [s]ection 6409(a)." (emphasis added)).

Indeed, the 2014 Order makes it even clearer that the FCC was establishing a formal application requirement for the start of the shot clock, including because the FCC was comparing its rule to state statutes dealing with reviews of formal applications:

> In addition to defining acceptable documentation requirements, we establish a specific and absolute timeframe for State and local processing of eligible facilities requests under [s]ection 6409(a). *We find that a 60-day period for review, including review to determine whether an application is complete*, is appropriate. In addressing this issue, it is appropriate to consider not only the record support for a time limit on review but also State statutes that facilitate collocation applications. Many of these statutes impose review time limits, thus providing valuable insight into States' views on the appropriate amount of time. Missouri, New Hampshire, and Wisconsin, for example, have determined that 45 days is the *maximum amount of time available to a municipality to review applications*, while Georgia, North Carolina, and Pennsylvania have adopted a 90-day review period, including review both for completeness and for

The plain meaning of 47 C.F.R. § 1.6100(c)(3) is that it requires a filed application to commence the shot clock, but the 2020 Ruling eliminates that requirement. Instead, the 2020 Ruling merely requires taking the first procedural step that the siting authority specifies and submitting written documentation showing that a proposed modification is an eligible facilities request. Neither of these actions concerns

---

> approval. Michigan's statute provides that *after the application is filed*, the locality has 14 days to deem the application complete and an additional 60 days to review. With consideration of the time periods adopted in these statutes, and for the further reasons discussed below, *we find it appropriate to adopt a 60-day time period as the time limit for review of an application under [s]ection 6409(a)*.

*Id.* at 12956–12957 (emphasis added) (footnotes omitted).

Moreover, the 2014 Order provides: "The 60-day period begins to run when the application is filed, and may be tolled only by mutual agreement or in cases where the reviewing State or local government determines that the application is incomplete." *Id.* at 12993. The 2014 Order lays out a multi-step process in which the government would then have 30 days after submission of the application to provide written notice to the applicant of "an initial determination of incompleteness." *Id.* at 12957. The 60-day timeframe would "begin running again when the applicant ma[de] a supplemental submission." *Id.* The siting authority could only toll the timeframe again by providing written notice to the applicant "within 10 days." *Id.* If the siting authority missed that second window, "the application [could] not thereafter be tolled for incompleteness." *Id.* at 12958. This formal process is inconsistent with the 2020 Ruling's determination that the shot clock begins running simply when the applicant takes the first procedural step and submits written documentation showing that a proposed modification is an eligible facilities request. Indeed, since under the 2020 Ruling no formal application is even required to start the shot clock, these provisions from the 2014 Order are essentially rendered meaningless.

*an application*, much less filing an application.  By departing from the 2014 Order in this way, the new Shot Clock Rule "create[s] rights" for applicants and "impose[s] obligations" upon siting authorities—which are hallmarks of a legislative rule.  *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003).  I would thus find that the 2014 Order is unambiguous as to the Shot Clock Rule, and no deference analysis is needed.  *See Kisor v. Wilkie*, 588 U.S. 558, 573 (2019).  Because the FCC has interpreted the Shot Clock Rule "to mean something other than its original meaning," *Erringer v. Thompson*, 371 F.3d 625, 632 (9th Cir. 2004) (quoting *Hemp Indus.*, 333 F.3d at 1091), I would find its interpretation a legislative rule.

The 2020 Ruling claimed that siting authorities could "effectively postpone the date on which they consider eligible facilities requests to be duly filed," and "thereby delay[] the commencement of the shot clock" by "treating applications as incomplete unless applicants have complied with time-consuming requirements" that have nothing to do with whether the proposal amounted to a substantial change in an existing structure.  2020 Ruling, 35 FCC Rcd. at 5985.  The per curiam opinion credits that concern.  Per Curiam Op. 36–37.  But if the 2014 Order created a problem, the solution was for the FCC to address it in a legislative rule utilizing the required APA notice-and-comment procedures.  The solution was not to simply change the rule without following the APA.

Because I believe that the FCC's purported clarification of the commencement of the shot clock is inconsistent with the unambiguous language of the 2014 Order, I would find its clarification a legislative rule.

**B.The Shot Clock Rule is Void Because It Is a Legislative Rule, and the Error Was Not Harmless.**

In the per curiam opinion, we hold that "the FCC did not follow the APA's procedural requirements in issuing the[] legislative rules [regarding the Concealment Provision and the Siting Approval Conditions Provision] through a declaratory ruling, without notice-and-comment procedures required under section 553." Per Curiam Op. 65. "Instead, the FCC followed its own proceedings on a much-truncated timeline and refused additional time to comment after it published the 2020 Draft Ruling." Per Curiam Op. 65.

We also hold, for several reasons, that "such failure [to follow the notice-and-comment procedures] was not harmless error because we cannot find that the error 'clearly had no bearing' on the result." Per Curiam Op. 65. First, "there is more than sufficient uncertainty" as to the effect of the FCC's failure, because "it is uncertain whether the FCC would still have adopted the rules had it received further public comments and criticism about the FCC's proposed clarifications regarding those provisions." Per Curiam Op. 66.

Second, we hold that "the FCC's decision not to utilize APA procedures has produced clarifications regarding the Concealment Provision and the Siting Approval Conditions Provision under which codified legislative rules do not mean what they say." Per Curiam Op. 66. We credit dissenting Commissioner Rosenworcel's statement that the FCC's "declaratory ruling . . . requires every state and local government to immediately review and update their current ordinances, policies, and application systems involving wireless towers," Per Curiam Op. 66 (quoting 2020 Ruling, 35 FCC Rcd. at 6034 (Comm'r Rosenworcel, dissenting)),

and observe that "[m]aking these very substantial changes using deficient procedures deprived Petitioners of an opportunity to criticize the proffered clarifications at a time *before* they were finally adopted," Per Curiam Op. 66–67.

Third, we also reject the FCC and the Industry Intervenors' argument that the APA violation was harmless due to the similarities between the FCC's proceedings here and the notice-and-comment procedures required by the APA. Per Curiam Op. 67. That is because "finding the significant APA error to be harmless would . . . work an evisceration of section 553." Per Curiam Op. 67; *see also Sprint Corp. v. FCC*, 315 F.3d 369, 376–77 (D.C. Cir. 2003) ("[I]f the government could skip those procedures, engage in informal consultation, and then be protected from judicial review unless a petitioner could show a new argument—not presented informally—section 553 obviously would be eviscerated." (quoting *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002))).

I join that section of the per curiam opinion. I believe that each argument in the per curiam opinion on this point with respect to the Concealment Provision and the Siting Approval Conditions Provision also applies to the FCC's failure with respect to the Shot Clock Rule. There is sufficient uncertainty about whether the FCC would have adopted the Shot Clock Rule had it followed the APA's procedural requirements. For example, Commissioner Starks dissented from the adoption of the Shot Clock Rule:

> I do agree that our rules could use clarification, but the item here consistently misses the mark. For example, we should clearly define when the [s]ection 6409 shot clock starts. But while the Declaratory

Ruling acknowledges the value of preliminary reviews and meetings, it nevertheless starts the shot clock before those events take place and provides no flexibility to adjust once an applicant submits its paperwork and requests that first meeting. Under today's decision, once an applicant has taken these actions, the local government must ensure that every other step in the process is completed before the shot clock expires. This approach not only places an unfair burden on the local governments but could lead to disputes between governments and applicants about the reasonableness of any requirement and whether it can be accomplished within the 60-day shot clock period. We should have done a rulemaking to discuss these issues and how to avoid such outcomes.

2020 Ruling, 35 FCC Rcd. at 6037 (Comm'r Starks, dissenting) (emphasis omitted).

Commissioner Starks also wrote that the clarifications "[t]aken as a whole ... [are] likely to lead to time-consuming and costly disputes about intent and reasonableness between local governments and industry." *Id.* at 6038. Commissioner Starks noted that the FCC should have "addressed these issues in a rulemaking proceeding," "receive[d] input from the public before . . . act[ing] further in this area," and "provided more time for that input." *Id.*

Therefore, I would find that the Shot Clock Rule was improperly issued as part of a declaratory ruling, and I would invalidate it.

## II.    The Express Evidence Requirement

The per curiam opinion concludes that "application of the Express Evidence Requirement would not have retroactive effect."  Per Curiam Op. 63.  I disagree.

The FCC clarified that to be a "concealment element" under the Concealment Provision, "the element must have been part of the facility that the [siting authority] approved in its prior review," 2020 Ruling, 35 FCC Rcd. at 5995, as demonstrated by "express evidence in the record . . . that a [siting authority] considered in its approval that a stealth design for a telecommunications facility would *look like something else*, such as a pine tree, flag pole, or chimney," *id.* at 5996 (emphasis added).  The FCC explained that the requirement "does not mean that a concealment element must have been explicitly articulated," and that "specific words or formulations are not needed."  *Id.*  "[S]how[ing] that the condition existed at the time of the original approval" is sufficient to demonstrate that an applicant had clear notice of the required condition.  *Id.* at 5998 n.123.

I would invalidate the Express Evidence Requirement because the Express Evidence Requirement is an impermissibly retroactive rule *and* the Spectrum Act does not permit retroactive rulemaking.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213–15 (1988).

### A.   The Express Evidence Requirement Is a Retroactive Rule.

A statute or administrative rule is retroactive when it "attach[es] . . . new disabilit[ies] in respect to transactions or considerations already past."  *Vartelas v. Holder*, 566 U.S. 257, 266 (2012) (cleaned up) (citation omitted).  To determine retroactivity, we "ask whether the new provision

attaches new legal consequences to events completed before its enactment." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269–70 (1994). "[F]amiliar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance" for this inquiry. *Id.* at 270.

The Express Evidence Requirement attaches new consequences to siting approvals by siting authorities that were completed before the publication of the 2020 Ruling or the 2014 Order. And it attached new consequences to such siting approvals complete before passage of the Spectrum Act in 2012. The FCC's purported clarification would deprive a siting authority of its right to enforce, or rely on, extant conditions at the time of its original approval of a wireless facility, conditions that may have been critical to the approval's issuance in the first place—no matter when that original approval occurred. This would upend settled expectations that those siting authorities may have had when acting under their local zoning laws. At no point did either Congress or the FCC provide, explain, or indicate that Petitioners needed to comply with an "express evidence" requirement with respect to concealment elements or conditions relating to their approvals of applications for the *initial* construction of a wireless facility—which, by definition, fall outside of section 6409(a).

The FCC argues that a rule is not retroactive just because it draws on past facts for its operations or upsets expectations. In doing so, the FCC confuses factors guiding the inquiry with the inquiry itself. The Express Evidence Requirement is retroactive because it "attaches new legal consequences to events completed before its enactment." *Landgraf*, 511 U.S. at 270. That it upsets expectations and draws on past facts while doing so are just signposts along the way.

The requirement also disrupts regulated parties' reasonable reliance interests. The presumption against retroactivity "does not require a showing of detrimental reliance." *Vartelas*, 566 U.S. at 273. But an agency cannot "apply a new rule retroactively when to do so would unduly intrude upon reasonable reliance interests." *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60 n.12 (1984). The likelier it is that a party relied on "prior law . . . [the stronger] the case for reading a newly enacted law prospectively." *Vartelas*, 566 U.S. at 274. Siting authorities that included concealment elements and other conditions—or relied on extant concealment elements or conditions—in their wireless siting approvals, reasonably relied on the legal requirements in effect *at the time of approval*, whether those were applicable requirements imposed by the siting authorities (before the Spectrum Act was enacted) or Spectrum Act requirements. The FCC's own rules stated that those rules applied to towers and base stations that have been "reviewed and approved under the *applicable* zoning or siting process." 47 C.F.R. § 1.6100(b)(5) (emphasis added). This indicates that a siting authority's "applicable" process is all that is required to establish the baseline where modifications start.

The FCC claims that "[t]o the extent the meaning of 'condition' and 'concealment elements' were unclear, [Petitioners] had no legitimate reliance interests in their 'own (rather convenient) assumption that unclear law would ultimately be resolved in [their] favor.'" (second alteration in original) (citation omitted). But before the Spectrum Act, Petitioners had no reason to believe that they needed to comply with *any* federal procedural requirements with respect to concealment elements or conditions. They were not conveniently interpreting an ambiguity in their favor;

instead, they had no reason to believe there was any ambiguity *at all*. Petitioners had no reason to think that a theoretical future statute or theoretical future rules interpreting that statute could require them to expressly recite extant concealment conditions they had relied on.

The FCC also argues that "[b]y specifying how to identify" the concealment elements and siting conditions referenced in the Concealment and Siting Approval Conditions Provisions, "the [2020 Ruling] 'explain[s] . . . the substantive law that already exists.'" (last alteration and ellipsis in original) (citation omitted). Not so. The 2020 Ruling states that "there must be express evidence that *at the time of approval* the locality required the feature and conditioned approval upon its continuing existence." 2020 Ruling, 35 FCC Rcd. at 5998 (emphasis added). Thus, the Express Evidence Requirement applies to actions by the siting authorities that took place *prior* to the 2014 Order and even *prior* to the Spectrum Act. Because the relevant statute and regulations had not yet been enacted, the FCC is incorrect in claiming that the 2020 Ruling merely explains the substantive law that already existed.

## B.  The Spectrum Act Does Not Authorize the FCC to Engage in Retroactive Rulemaking.

"[A]n administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen*, 488 U.S. at 208. Retroactive application of statutes and administrative rules is "not favored in the law." *Id.* Thus, "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules *unless that power is conveyed by Congress in express terms*." *Id.* (emphasis added).

Therefore, we analyze the Spectrum Act to see if it conveys "in express terms" the power to promulgate retroactive rules. "As always, we begin with the text." *Saxon*, 596 U.S. at 457. Section 6409(a) of the Spectrum Act states: "[A] State or local government may not deny, and shall approve, any eligible facilities request for a modification of an *existing* wireless tower or base station that does not substantially change the physical dimensions of such tower or base station." 47 U.S.C. § 1455(a)(1) (emphasis added). By its terms, section 6409(a) applies only to modifications or replacements of "existing" wireless facilities. *Id.* It does not apply to a siting authority's initial approval of a facility that a subsequent section 6409(a) application proposes to modify or replace. In fact, it does not so much as refer to the initial approval—explicitly or obliquely. As a result, I would find that the FCC lacks the authority to promulgate rules that retroactively impose legal consequences on such prior initial approval of a wireless facility by a siting authority. *See Bowen*, 488 U.S. at 208. I would also find that the FCC likewise lacks the authority to declare that legislative rules it previously promulgated apply retroactively to initial approvals. *See id.*

## C.  The Express Evidence Requirement Is Void.

Because the Express Evidence Requirement is a retroactive rule, and because the Spectrum Act does not authorize retroactive rulemaking, the Express Evidence Requirement is void.[5]

---

[5] Neither the FCC nor the Industry Intervenors have argued that we need to engage in harmless-error analysis if the Express Evidence Requirement is an impermissibly retroactive rule.

### III.    The Separation Clause

I agree with the per curiam opinion that "the 2020 Ruling's clarification of the Separation Clause is an interpretative rule." Per Curiam Op. 40.  But I disagree with its analysis.  I would find the Separation Clause ambiguous, and that the FCC's clarification is entitled to *Auer* deference. In *Kisor*, the Supreme Court clarified that "only if a regulation is genuinely ambiguous" can "the possibility of deference . . . arise."  588 U.S. at 573.  Under what is commonly known as *Auer* deference, we defer to the agency's interpretation only if it "is 'reasonable,' is based on the agency's 'substantive expertise,' 'reflect[s] [the agency's] fair and considered judgment,' and represents 'the agency's authoritative or official position.'"  *Attias v. Crandall*, 968 F.3d 931, 937 (9th Cir. 2020) (alterations in original) (quoting *Kisor*, 588 U.S. at 575–79).  If an agency's reading of a rule does not meet all four *Auer* factors, that reading does not merit *Auer* deference.  *See id.* at 937.

I believe that the Separation Clause is ambiguous.

The 2014 Order states:

> A modification substantially changes the physical dimensions of an eligible support structure if . . . :
>
> (i) For towers other than towers in the public rights-of-way, it increases the height of the tower by more than 10% or *by the height of one additional antenna array with separation from the nearest existing antenna not to exceed twenty feet*, whichever is greater [(the Separation Clause)];  for other eligible support structures, it increases the height of

the structure by more than 10% or more than ten feet, whichever is greater[.]

47 C.F.R. § 1.6100(b)(7)(i) (emphasis added).

Petitioners frame their interpretation of the 2014 Order as providing that "a tower could grow by 10% or 20 feet—but no taller."  The FCC and the Industry Intervenors argue that "separation" means the "intervening space" or "gap" between the two antennas. (quoting *Separation*, Merriam-Webster, https://www.merriam-webster.com/dictionary/separation (last visited Aug. 28, 2024)).  At an initial reading, it is unclear that the plain language of the 2014 Order directly supports either reading.

On the one hand, I agree with the per curiam opinion that, under Petitioners' reading, "the phrase 'by the height of one additional antenna array with separation from the nearest existing antenna not to exceed' would be redundant and unnecessary."  Per Curiam Op. 41 (citing *NLRB v. Aakash, Inc.*, 58 F.4th 1099, 1105 (9th Cir. 2023) (noting that the rule against surplusage generally prohibits us from interpreting the regulation in a way that "mak[es] a part of it unnecessary")).

On the other hand, the FCC and Industry Intervenors' reading would have been the "plain and unambiguous meaning of the Separation Clause," Per Curiam Op. 41, had the 2014 Order stated, for example: "A modification substantially changes the physical dimensions of an eligible support structure if it increases the height of the tower by more than 10%; or by the distance between the top of the existing structure and the bottom of the modification (not to exceed twenty feet); whichever is greater."  But because the

2014 Order does not so state, I would find the Separation Clause ambiguous.

Because I believe that the Separation Clause is "genuinely ambiguous," "the possibility of [*Auer*] deference . . . arise[s]." *Kisor*, 588 U.S. at 573. First, the FCC's clarification is "reasonable," *Attias*, 968 F.3d at 937, and "come[s] within the zone of ambiguity." *Kisor*, 588 U.S. at 576 (analyzing the "text, structure, history, and so forth [to] establish the outer bounds of permissible interpretation"). As the per curiam opinion notes, we may consider the reasonableness of the FCC's interpretation "as a matter of policy." Per Curiam Op. 44 (citing *M&T Farms v. Fed. Crop Ins. Corp.*, 103 F.4th 724, 730 (9th Cir. 2024)). And there is "no reason why the FCC's interpretation is inconsistent with a reasonable interpretation of 'substantial change.'" Per Curiam Op. 44 (noting that (1) "Petitioners fail to explain why a threshold of one antenna plus twenty feet (*i.e.*, *typically* between 24 and 28 feet) is a substantial change"; and (2) "Petitioners . . . do not point to any evidence that . . . large antennas [that are several hundred feet tall] are collocated on existing towers, or could be collocated in compliance with structural codes, FAA regulations, and other limitations that continue to apply").

Next, because the FCC's reasonable interpretation at least "come[s] within the zone of ambiguity the court has identified after employing all its interpretive tools," *Kisor*, 588 U.S. at 576, I would also find that the interpretation reflects "the agency's authoritative or official position" that "implicate[s] its substantive expertise," *id.* at 577 (citation and internal quotation marks omitted), because the FCC drew upon its experience in addressing this exact question in the 2001 Collocation Agreement.

Petitioners argue that the FCC's "substantive expertise" is not implicated here because the 2001 Collocation Agreement represents a shared understanding among multiple agencies and implements obligations under the National Historic Preservation Act, which the FCC does not administer.  (citing *Envirocare of Utah, Inc. v. Nuclear Regul. Comm'n*, 194 F.3d 72, 79 n.7 (D.C. Cir. 1999), for the proposition that courts do not defer to any one agency's particular interpretation when a statute is administered by several different agencies).  But that does not change the fact that the FCC determination that Petitioners' position "would undermine the [Spectrum Act's] objective to facilitate streamlined review of modifications of existing wireless structures," 2020 Ruling, 35 FCC Rcd. at 5990, reflected both the FCC's "fair and considered judgment," *Kisor*, 588 U.S. at 579 (citation omitted), and "implicate[d] its substantive expertise," *id.* at 577.

Finally, the FCC's clarification also reflects its "fair and considered judgment," as there is no evidence in the record showing that it was a "convenient litigating position" or a "*post hoc* rationalization."  *Id.* at 579 (brackets omitted) (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)).

Because the FCC's clarification meets all *Auer* factors, the Separation Clause's ambiguous language is entitled to *Auer* deference and is an interpretive rule.  The clarification would also survive arbitrary-and-capricious review.  *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (requiring that an agency action "be reasonable and reasonably explained" under the APA's arbitrary-and-capricious standard).  The "deferential" standard of this review resolves this inquiry.  Based on the record before us, and the possible interpretations of what "separation" could

mean in context, the FCC has "acted within a zone of reasonableness." *Id.*

## IV.   The Concealment and Siting Approval Conditions Provisions

I join the per curiam opinion with respect to the Concealment Provision and the Siting Approval Conditions Provision.  I agree that after exhausting all the traditional tools of construction, the FCC's purported clarifications are inconsistent with the unambiguous text of the 2014 Order. Per Curiam Op. 55.

I write separately to emphasize that even were we to find ambiguity, I would not accord the FCC's clarifications deference.  As noted above, if an agency's reading of a rule does not meet all four *Auer* factors, that reading does not merit *Auer* deference.  *See Attias*, 968 F.3d at 937.  I would find that the FCC's interpretations of a "concealment element" do not "implicate its substantive expertise." *Kisor*, 588 U.S. at 577.

The Supreme Court has long recognized that state and local governments have the authority to impose land use, zoning, and other aesthetic requirements. *See, e.g.*, *T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 300 (2015) ("The [Telecommunications] Act generally preserves 'the traditional authority of state and local governments to regulate the location, construction, and modification' of wireless communications facilities like cell phone towers, but imposes 'specific limitations' on that authority." (quoting *Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005))).  "When Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Raygor*

*v. Regents of Univ. of Minn.*, 534 U.S. 533, 543 (2002) (citation and internal quotation marks omitted). Nothing in section 6409(a)'s "substantially change"[6] standard reflects a congressional intent to alter or micromanage *how* siting authorities (including state and local governments) address the visual impact of wireless towers and base stations. In other words, the statute does not appear to grant the FCC authority to impose a federal preference for one type of concealment element (e.g., color or stealth design) over another (size and location).

If the 2020 Ruling's "look like something else" standard for concealment elements, 2020 Ruling, 35 FCC Rcd. at 5996, were allowed to stand, siting authorities would no longer be able to rely on existing environmental features like tree lines or rooftop setback requirements—which likely impose minimal incremental cost on the applicant—to minimize the visual impact of new deployments of wireless facilities. Instead, siting authorities, in order to mandate concealment that would last, would need to initially impose more expensive camouflage design requirements on all original wireless facilities applications, as these would be the only form of permissible "concealment elements" that could be preserved in the event of future section 6409(a) modifications.

Siting authorities have the exclusive authority and expertise, based on their familiarity with the unique sites,

---

[6] As a reminder, "a State or local government may not deny, and shall approve, any eligible facilities request for a modification of an existing wireless tower or base station that does not *substantially change* the physical dimensions of such tower or base station." Pub. L. No. 112-96, § 6409(a), 126 Stat. 156, 232–33 (2012) (codified at 47 U.S.C. § 1455(a)) (emphasis added).

features, and structures within their jurisdictions, to fashion concealment element requirements—be they setback requirements, natural or artificial screening, or camouflage material—that will most effectively minimize the visual impact of wireless facilities at the least cost. And nothing about the terms "conceal" or "element" necessarily implicates the FCC's substantive expertise. Indeed, neither the FCC nor the Industry Intervenors argue that interpreting these terms implicates the FCC's substantive expertise.

That the FCC lacks substantive expertise is sufficient for us to not accord its interpretations *Auer* deference (again, assuming ambiguity). I would also decline to accord *Auer* deference because the FCC's interpretations reflect "a merely convenient litigating position or *post hoc* rationalization advanced to defend past agency action against attack." *Kisor*, 588 U.S. at 579 (cleaned up) (citation omitted). In its brief to the Fourth Circuit in *Montgomery County v. FCC*, 811 F.3d 121 (4th Cir. 2015), a case the FCC won, the FCC challenged Montgomery County, Maryland's argument that "the *[2014] Order* fails to protect local aesthetic values because it 'does not allow a locality to impose concealment requirements if the modification makes a facility which was previously not visible, visible." Brief for Respondents, 2015 WL 3636791, at *40 (citation omitted). The FCC argued that such an argument "rest[ed] on an overly narrow reading of the *[2014] Order*," which provides that "'*any* change that defeats the concealment elements' of a wireless tower or base station 'would be considered a "substantial change" under [s]ection 6409(a).'" *Id.* (last emphasis added). The FCC stated: "[W]here an existing tower is concealed by a tree line and its location below the tree line was a consideration in its approval, an extension that would raise the height of the tower above the

tree line would constitute a substantial change, and a zoning authority could impose conditions designed to conceal the modified facility." *Id.* at \*41. If the extension over the tree line defeated a concealment element as the FCC represented to the Fourth Circuit, this directly contradicts the FCC's "reinterpretation" that "careful placement conditions" cannot be concealment elements.

At oral argument, we asked the FCC how to reconcile this discrepancy, and counsel stated in effect that the FCC cannot be held to its prior statements because it was not addressing the exact same issue here. Oral Arg. 38:48–40:36. Regardless, the FCC's recognition that it has changed course solidifies for us that we should not give the clarification *Auer* deference. *Kisor*, 588 U.S. at 579 (requiring an agency's reading of a rule "reflect fair and considered judgment" and refusing to "defer to a merely convenient litigating position or *post hoc* rationalization advanced to defend past agency action against attack" (cleaned up) (citations omitted)).

Even if not affording an agency interpretation *Auer* deference, a reviewing court may still "accord the [agency's] interpretation a measure of deference proportional to the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *SmithKline Beecham Corp.*, 567 U.S. at 159 (internal quotation marks and citation omitted). This is known as *Skidmore* deference.[7] Here, however, for similar reasons to those I discuss above, including because of the discrepancy in its litigating positions, I would not accord the FCC's clarifications *Skidmore* deference, which considers

---

[7] *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

the "[the agency's] consistency with earlier and later pronouncements." *Id.*

*     *     *

For the reasons above, I would grant the petition for review with respect to the FCC's clarifications regarding the Shot Clock Rule and the Express Evidence Requirement. While I agree with the per curiam opinion that we should deny the petition for review with respect to the Separation Clause in the Tower Height Provision, I would find the Separation Clause ambiguous and accord the FCC's clarification *Auer* deference. Finally, while I also agree with the per curiam opinion that the Concealment and Siting Approval Conditions Provisions are inconsistent with the unambiguous text of the 2014 Order, I would go further and hold that, even assuming such provisions were ambiguous, the FCC's clarifications would not be entitled to deference. Thus, I respectfully dissent in part, and concur in part.